# 23-87

IN THE

# United States Court of Appeals for the Second Circuit

THOMAS COLE,
*Plaintiff - Appellant,*

v.

FOXMAR, INC., d/b/a EDUCATION AND TRAINING RESOURCES,
*Defendant - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

**BRIEF FOR THE PLAINTIFF-APPELLANT**

William Pettersen, Esq.
Pettersen Law PLLC
1084 E. Lakeshore Dr.
Colchester, VT 05446
(802) 477-2780
*Attorney for Plaintiff-Appellant*

# TABLE OF CONTENTS

Table of Contents .................................................................................. i-iv

Table of Authorities ........................................................................... v-viii

Jurisdictional Statement ..........................................................................1

Statement of the Issues...........................................................................1

Statement of the Case............................................................................2

   A. Procedural History.........................................................................2

   B. Facts of the Case...........................................................................2

      i.  Background.............................................................................2

      ii. VOSHA and VESTA Violations ..................................................4

      iii. Plaintiff's VOSHA and VESTA Complaints ...............................5

      iv. Termination...........................................................................6

      v.  Retaliatory Intent and Deceit....................................................8

      vi. Pattern of Suppression of Safety Complaints Endangering Others ...........9

   C. Verdict and Post-Trial Proceedings ...............................................11

Summary of Argument.........................................................................12

Argument............................................................................................14

I.      THE DISTRICT COURT ABUSED ITS DISCRETION BY ORDERING A NEW TRIAL ON DAMAGES ...........................................14

   A.     STANDARD OF REVIEW................................................14

i

B.   SUFFICIENT EVIDENCE SUPPORTED THE JURY'S AWARD OF
     LOST WAGES AND THERE WAS NO BASIS FOR THE AWARD
     TO BE OVERTURNED ...................................................................... 15

     1.   Sufficient evidence supported the jury's finding that Plaintiff
          would have remained employed at NJCC until retirement had
          he not been terminated ............................................................. 15

     2.   The District Court's reasons for overturning the jury's award of
          lost wages were erroneous ........................................................ 17

          i.    Terminations and resignations of other employees at NJCC
                ............................................................................................. 18

          ii.   Plaintiff's request for reassignment ..................................... 19

          iii.  Plaintiff's work history ......................................................... 21

          iv.   Plaintiff's mitigation of damages ......................................... 23

          v.    Plaintiff's expert did not make any improper assumptions . 24

          vi.   The jury's award of lost wages was only $4,227 more than
                Plaintiff requested ................................................................. 26

C.   SUFFICIENT EVIDENCE SUPPORTED THE JURY'S AWARD OF
     PUNITIVE DAMAGES AND THERE WAS NO BASIS FOR THE
     AWARD TO BE OVERTURNED ...................................................... 28

     1.   Sufficient evidence supported the jury's award of punitive
          damages under the State Farm guideposts ............................... 29

          i.    Guidepost 1 ......................................................................... 30

                a)   Harm caused was physical as opposed to economic ...... 31

                b)   Indifference and reckless disregard for the health or
                     safety of others ................................................................. 31

c) The targets of the conduct had financial vulnerability ...36

d) The conduct involved repeated actions and was not an isolated incident ...............................................................37

e) The harm was the result of intentional malice, trickery, and deceit .......................................................................38

ii. Guideposts 2 and 3 ................................................................40

a) Federal case law .............................................................41

b) Vermont case law ...........................................................45

c) Policy of punitive damages .............................................47

d) Financial evidence .........................................................49

2. The District Court's reasons for overturning the jury's award of punitive damages were erroneous ............................................50

i. Defendant's conduct was not limited in scope, and the duration of the conduct did not negate high reprehensibility ...............................................................................................51

ii. Plaintiff's probationary period was irrelevant ....................51

iii. The jury properly disregarded Defendant's claim that it was trying to reestablish higher standards at NJCC ..................52

iv. Defendant's claim of good faith mistake was properly disregarded by the jury ........................................................53

v. Retaliation against other employees for making safety complaints ............................................................................53

vi. The civil penalties under VOSHA and VESTA do not contradict the jury's punitive damages award ....................54

iii

II.   IN THE ALTERNATIVE, THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO GRANT REMITTITUR ....................56

   A.   STANDARD OF REVIEW ................................................................56

   B.   THE VERDICT DID NOT INDICATE PREJUDICE BY THE JURY ............................................................................................57

   C.   POLICY FAVORS REMITTITUR OVER RETRIAL ......................58

III.  IN THE ALTERNATIVE, THE DISTRICT COURT ABUSED ITS DISCRETION BY EXCLUDING EVIDENCE AT RETRIAL ...............59

   A.   STANDARD OF REVIEW ................................................................59

   B.   THE EXCLUDED EVIDENCE WAS ADMISSIBLE ......................60

IV.   CONCLUSION .......................................................................................62

Certificate of Compliance ..........................................................................63

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Metro-N. Commuter R.R.*, 493 F. App'x 149 (2d Cir. 2012)..........17, 27

*Auster Oil & Gas, Inc. v. Stream,* 835 F.2d 597 (5th Cir.1988).............................57

*Bergerson v. New York State Office of Mental Health, Cent. New York Psychiatric Ctr.*, 526 Fed.Appx. 109 (2d Cir. 2013) ...................................................................23

*BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ........................................................................................................................29

*Bonura v. Sea Land Serv., Inc.,* 505 F.2d 665 (5th Cir.1974) ................................56

*Broadnax v. City of New Haven*, 141 F. App'x 18 (2d Cir. 2005) ..........................27

*Broome v. Biondi*, 17 F. Supp. 2d 211 (S.D.N.Y. 1997)..........................................55

*Clymer v. Webster*, 156 Vt. 614, 596 A.2d 905 (1991) ...........................................55

*Cole v. Foxmar, Inc.*, No. 2:18-CV-00220, 2022 WL 842881 (D. Vt. Mar. 22, 2022), *reconsideration denied,* No. 2:18-CV-00220, 2022 WL 18456824 (D. Vt. June 13, 2022) .............................................................................................................2

*Cooper v. Cooper*, 173 Vt. 1, 783 A.2d 430 (2001)................................................45

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 121 S. Ct. 1678, 149 L. Ed. 2d 674 (2001) ........................................................................................15

*Crump v. P & C Food Markets, Inc.,* 154 Vt. 284, 576 A.2d 441 (1990).........29, 41

*Earl v. Bouchard Transp. Co.*, 917 F.2d 1320 (2d Cir. 1990)........................... 57-58

*Eisenberg v. Reid*, 74 F. App'x 110 (2d Cir. 2003) ...........................................30, 42

*Fishman v. Clancy*, 763 F.2d 485 (1st Cir. 1985) ...................................................50

*Glidden v. Skinner*, 142 Vt. 644, 458 A.2d 1142 (1983)........................................29

*Greenmoss Builders, Inc. v. Dun & Bradstreet, Inc.*, 49 Vt. 365, 543 A.2d 1320 (1988) ...................................................................................................................45

*Hammer v. Residential Credit Solutions, Inc.*, No. 13 C 6397, 2015 WL 7776807 (N.D. Ill. Dec. 3, 2015) ...........................................................................................43

*Havill v. Woodstock Soapstone Co.*, 2007 VT 17, 181 Vt. 577 (2007)...................28

*Holland v. Schwan's Home Serv., Inc.*, 2013 IL App (5th) 110560, 992 N.E.2d 43 ................................................................................................................................ 46-47

*In re Lilly*, 173 Vt. 591, 795 A.2d 1163 (2002) ................................................. 23-24

*In re Vivendi Universal, S.A. Sec. Litig.,* 765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) .....................27

*Imbrogno v. Chamberlin*, 89 F.3d 87 (2d Cir. 1996)................................................56

*Kennedy v. Supreme Forest Products, Inc.*, 761 F. App'x 72 (2d Cir. 2019)...........32

*Kwon v. Edson*, 2019 VT 59, 210 Vt. 557, 217 A.3d 935 (2019) ............................55

*Luca v. Cnty. of Nassau*, 344 F. App'x 637 (2d Cir. 2009)...............................22, 27

*Luciano v. Olsten Corp.,* 110 F.3d 210 (2d Cir. 1997).......................................47, 50

*Mathie v. Fries*, 121 F.3d 808 (2d Cir. 1997)..........................................................49

*Mathieu Enterprises, Inc. v. Patsy's Companies*, 2009 VT 69, 186 Vt. 557, 978 A.2d 481 (2009) ........................................................................................................56

*Mirlis v. Greer*, 952 F.3d 36 (2d Cir. 2020) ...........................................................15

*Motorola Credit Corp. v. Uzan*, 509 F.3d 74 (2d Cir. 2007).............................31, 55

*Padilla v. Metro–North Commuter R.R.*, 92 F.3d 117 (2d Cir. 1996).....................22

*Perry v. Ethan Allen, Inc.*, 115 F.3d 143 (2d Cir. 1997) .........................................59

*Provost v. City of Newburgh*, 262 F.3d 146 (2d Cir. 2001)................................. 49-50

*Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38 (2d Cir. 1997) .......
................................................................................................................ 57-58

*Rousseau v. Coates*, No. 2:18-CV-205, 2022 WL 3910990 (D. Vt. Aug. 30, 2022)
...........................................................................................................................57

*Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609 (N.D. Ill. 2019).43

*S.E.C. v. McGinnis*, No. 5:14-CV-6, 2015 WL 5643186 (D. Vt. Sept. 23, 2015) ...59

*Shahi v. Madden*, 2008 VT 25, 183 Vt. 320, 949 A.2d 1022 (2008)
......................................................................................... 29, 40-41, 46, 49

*Sims v. Blot,* 534 F.3d 117 (2d Cir. 2008) ...............................................14

*Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363 (2d Cir. 1988) .............. 14-15, 49

*State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 123
S.Ct. 1513, 155 L.Ed.2d 585 (2003) ...................................................... 29-30, 32, 54

*Sweet v. Roy*, 173 Vt. 418, 801 A.2d 694 (2002)........................................29, 41, 45

*Tesser v. Bd. of Educ.,* 370 F.3d 314 (2d Cir.2004) ...............................................60

*Trickey v. Kaman Indus. Techs. Corp.*, 705 F.3d 788 (8th Cir. 2013).....................30

*Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140 (2d Cir. 2014) ...............................43

*TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125
L.Ed.2d 366 (1993) ........................................................................ 32, 41, 43-45, 51

*Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176 (2d Cir. 1992) ......................... 26-27

*United States v. Dennis*, 625 F.2d 782 (8th Cir.1980)............................................59

*Wells v. Dallas Indep. School Dist.*, 793 F.2d 679 (5th Cir.1986) .........................57

*Weidler v. Big J Enterprises, Inc.*, 1998-NMCA-021 124 N.M. 591, 953 P.2d 1089 ..............................................................................................32, 47

*Zakre v. Norddeutsche Landesbank Girozentrale*, 344 F. App'x 628 (2d Cir. 2009) ..........................................................................................60

*Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003)..........................43

## **Statutes and other Authorities**

21 V.S.A. § 210 ...........................................................................................54

21 V.S.A. § 232 ...........................................................................................55

21 V.S.A. § 345 ...........................................................................................54

21 V.S.A. § 348 ...........................................................................................54

21 V.S.A. § 397 ...........................................................................................55

21 V.S.A. § 483 ........................................................................................4, 54

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1332 ...........................................................................................1

F.R.E. 403....................................................................................................59

F.R.E. 801....................................................................................................61

F.R.E. 803............................................................................................... 61-62

Vt. Admin. Code 13-5-13..............................................................................55

## JURISDICTIONAL STATEMENT

The District Court has subject matter jurisdiction based on diversity of citizenship and the controversy exceeding $75,000 exclusive of costs and interest. 28 U.S.C. § 1332.

The Second Circuit has appellate jurisdiction based on final judgment. 28 U.S.C. § 1291. Following a jury trial, judgment was issued against Defendant for unlawful retaliation in the amount of $3,215,000. (A-25). On August 27, 2021, Defendant filed a Motion for Judgment as a Matter of Law, or in the Alternative, a New Trial. (A-26). On March 22, 2022, the District Court granted Defendant's Motion, in part, and ordered a new trial on damages. (A-58). Judgment at retrial on damages was issued on December 20, 2022 in the amount of $55,000. (A-61). Plaintiff filed a Notice of Appeal on January 18, 2023. (A-62).

## STATEMENT OF THE ISSUES

1. Did the District Court abuse its discretion by overturning the jury's verdict and ordering a new trial on damages?

2. In the alternative, did the District Court abuse its discretion by failing to provide Plaintiff the opportunity to accept remittitur?

3. In the alternative, did the District Court abuse its discretion by excluding evidence at retrial?

## STATEMENT OF THE CASE

### A. Procedural History

Plaintiff Thomas Cole ("Plaintiff") brought claims to trial against Defendant Foxmar, Inc. d/b/a Education and Training Resources ("Defendant") for unlawful retaliation under the Vermont Occupational Safety and Health Act ("VOSHA") and the Vermont Earned Sick Time Act ("VESTA"). The jury returned a verdict for Plaintiff on both claims in the amount of $3,215,000. (A-22-25).

The District Court, the Honorable Christina Reiss presiding, granted Defendant's motion for a new trial on damages. (A-58); *Cole v. Foxmar, Inc.*, No. 2:18-CV-00220, 2022 WL 842881, at *19 (D. Vt. Mar. 22, 2022), *reconsideration denied,* No. 2:18-CV-00220, 2022 WL 18456824 (D. Vt. June 13, 2022). A verdict was issued at retrial in the amount of $55,000. (A-59-61). Plaintiff timely appealed. (A-62).

### B. Facts of the Case

#### i.    *Background*

The Job Corps program is run by the U.S. Department of Labor ("DOL"), which contracts the oversight of campuses to contractors for approximately 80% of the 125 Job Corps campuses in the country. (A-505-07). Students attend Job Corps in order to obtain high school equivalency and vocational training, including urban forestry, welding, clinical and medical assistance, culinary arts, and auto

2

repair. (A-505-06). Students live on campus away from their families and are sixteen to twenty-four years old. (A-243-44, 504-05). At the time of trial, Defendant oversaw nine Job Corps campuses under contracts with the DOL. (A-379-80).

Defendant entered into a contract with the DOL to oversee the Northlands Job Corps Center ("NJCC") in Vergennes, Vermont, beginning on June 1, 2018. (A-27). The DOL required Defendant to rehire existing non-managerial employees, including Plaintiff, under the right of first refusal. (A-588-89). Plaintiff worked at NJCC full and part-time from 2013 until 2018. (A-66-68, 704-07). He was fifty-seven at the time of trial and planned to work until he was seventy. (A-64, 168). At the time of termination, Plaintiff was a full-time Residential Counselor tasked with overseeing the health and safety of students in the dorms. (A-73-75).

Defendant terminated Plaintiff's employment on July 27, 2018 for allegedly missing three consecutive days of work without notice. (A-774). This reason was proven false at trial. (A-76, 115-16, 138-39). Plaintiff was terminated the same week he complained of VOSHA and VESTA violations and the same day he put those complaints in writing. (A-98-100, 123, 770, 772).

*ii.* ***VOSHA and VESTA Violations***

On Monday, July 23, 2018, Plaintiff witnessed a sick coworker unable to take sick leave. Residential Counselor Tori Ramon ("Ms. Ramon") told her supervisor, Angela Mobley ("Ms. Mobley") that she was "not feeling well" and "had things coming out both ends" and "was dizzy." (A-82-83). Ms. Mobley, did not tell Ms. Ramon she could go home and instead stated, "you folks in Vermont need to take your medicine." (A-83). Ms. Mobley told Ms. Ramon a replacement would need to be found for her to go home. (A-85, 185). Ms. Ramon was not able to go home and worked her entire nine-hour shift. (A-86-87).

This was not an isolated incident but was part of an overall policy by Defendant to prohibit employees from taking sick leave unless they first found a replacement. (A-228-29, 251, 321-22). Defendant's policy was in direct violation of VESTA's prohibition on requiring employees to find replacements in order to take sick leave. 21 V.S.A. § 483(g). This policy risked the health of the employees and students, with whom employees worked closely on a daily basis. (A-103-04).

Also on Monday, Plaintiff became aware students did not have the required cleaning supplies they needed to clean their dorm building.[1] (A-92). Students were required to clean all dorm buildings themselves, and there were no maintenance staff to clean the dorms. (A-327, 527). The students could not say

---

[1] Days herein refer to the week of July 23, 2018 unless otherwise stated.

how long they had been out of cleaning supplies. (A-92-93). The dorms were dirty and in deplorable condition. (A-327). Defendant regularly failed to provide cleaning supplies that students needed. (A-227, 326-27). Due to the lack of cleaning supplies, employees were forced to buy cleaning supplies for the students themselves with their own money. (A-327).

Plaintiff believed the lack of cleaning supplies was a violation of law and posed a danger to the students because they lived in close proximity with one another, and cleaning was necessary to prevent illness. (A-107). He believed it was unsanitary and also posed a risk to the employees. (A-772).

### iii. *Plaintiff's VOSHA and VESTA Complaints*

On Tuesday morning, Plaintiff complained to Center Director Alicia Grangent ("Ms. Grangent") about the unlawful sick leave policy and lack of cleaning supplies. (A-98-101, 221, 245-46). That afternoon, Plaintiff again complained to Ms. Grangent after discovering employees were still being made to work sick. (A-114, 247). He complained that employee Paige Howell ("Ms. Howell") was not able to go home sick because she did not have a replacement. (A-247).

On Wednesday, Plaintiff called Defendant's corporate headquarters and left a voicemail that there were difficulties at NJCC he would like to speak about. (A-118). He also attempted to speak with HR Director Bernadette Brookes ("Ms.

Brookes"). (A-119-20). Plaintiff spoke with Ms. Brookes' Assistant, Mari

Trybendis ("Ms. Trybendis"), and reported his complaints about the lack of

cleaning supplies and sick employees working. (A-120, 487-88).

On Thursday, Plaintiff again called Defendant's corporate headquarters and

left another voicemail that there were difficulties at NJCC, and that he was

looking for assistance. (A-122). Plaintiff did not hear back from Ms. Grangent,

Ms. Trybendis, Ms. Brookes, or the corporate office on any of his attempts to

speak about his safety complaints. (A-122-23, 131-32).

On Friday morning, Plaintiff drafted a letter outlining his safety complaints,

addressed it to Ms. Brookes, emailed it to her Assistant, Ms. Trybendis, cc'd Ms.

Grangent, and asked for it to be directed to the appropriate parties. (A-123, 770,

772).

### iv. *Termination*

Defendant terminated Plaintiff the same week he made his safety

complaints and the same day he put those complaints in writing. (A-98-100, 123,

770, 772). On Friday, after Plaintiff delivered his safety complaint letter,

Defendant immediately began emailing about terminating Plaintiff's employment.

(A-823-34, 842). Defendant's Vice President and Chief Operating Officer

Howard Harmon ("Mr. Harmon") emailed Ms. Brookes and Ms. Grangent that he

would prefer to release Plaintiff. (A-271, 504, 823-24). Mr. Harmon drafted a

6

Termination Notice and emailed it to Ms. Brookes.  (A-421, 833-34).  Ms.

Brookes met with Plaintiff and terminated his employment.  (A-133-34).

The Termination Notice stated Plaintiff was terminated for leaving work

early on Monday, without notice, and missing Tuesday and Wednesday, thereby

committing the major violation of job abandonment.  (A-774).  Each of these

allegations was untrue.  On Monday, Plaintiff worked his entire shift.  (A-76,

138).  On Tuesday, he left work early but notified the Center Director.  (A-115-16,

139).  On Wednesday, he had a scheduled day off and therefore did not miss work.

(A-140).

Mr. Harmon and Ms. Brookes admitted they did nothing to verify Plaintiff

missed Monday, Tuesday, and Wednesday.  (A-417, 427, 538).  They both had

access to all of Plaintiff's timecards and could have reviewed them to see what his

schedule was.  (A-428-29, 836).  They also had the ability to review Plaintiff's

weekly schedule, but neither of them did.  (A-417, 427, 538).  Mr. Harmon

claimed there was no schedule for Residential Counselors, which was directly

contradicted.  (A-73, 512, 767).

Ms. Grangent refused to sign the Termination Notice, even though she was

a required signatory.  (A-774).  Ms. Brookes brought Ms. Grangent the

Termination Notice and said, "this is what we're doing.  Corporate is on board.

They want you to sign it."  (A-258).  Ms. Grangent told Ms. Brookes there was no

7

evidence Plaintiff had missed three days of work, and she refused to sign.  (A-257-59, 262-63).

### v.     *Retaliatory Intent and Deceit*

Mr. Harmon and Ms. Brookes both testified they did not know the reason for termination was false until after the termination.  (A-417, 540).  However, evidence at trial directly contradicted their testimony.  Ms. Grangent told corporate officers, including Mr. Harmon, that Plaintiff had not missed three days of work and should not be terminated.  (A-253-54, 272-73, 305-06).

Ms. Grangent also told Ms. Brookes that Plaintiff had provided notice that he was leaving early on Tuesday.  (A-251).  Prior to the termination, Mr. Harmon acknowledged Plaintiff needed to be paid for Tuesday because he showed up to work.  (A-534-35).  Mr. Harmon also received an email from Ms. Brookes prior to the termination, in which she made clear Plaintiff had also worked Monday and Tuesday, so they needed to approve his "punches through Tuesday."  (A-418-20, 831).  The workweek began on Monday, making the only possible punches through Tuesday to be Monday and Tuesday.  (A-543).  Mr. Harmon and Ms. Brookes also had access to Plaintiff's timecards and weekly schedule, which both showed he was not scheduled to work on Wednesday.  (A-73, 417, 427-29, 538, 767, 836).

Mr. Harmon and Ms. Brookes also testified they did not know about Plaintiff's safety complaints until after the termination. (A-397, 400, 521, 539). However, evidence showed they both knew of the safety complaints prior to the termination. Ms. Grangent told Mr. Harmon, other corporate officers, and Ms. Brookes about Plaintiff's safety complaints prior to the termination. (A-299, 302-03). Ms. Brookes was also forwarded Plaintiff's email and complaint letter from Ms. Trybendis at 9:56 a.m. on Friday. (A-402-03, 826). Ms. Brookes wrote an email at 11:07 a.m. on Friday referencing Plaintiff's complaint letter. (A-414-15, 772, 842). Ms. Trybendis and Ms. Howell also both spoke with Ms. Brookes about Plaintiff's complaints prior to his termination. (A-319-20, 488-89).

### vi. *Pattern of Suppression of Safety Complaints Endangering Others*

Plaintiff's termination was part of an overall pattern by Defendant of intentionally suppressing safety complaints that risked the health and safety of employees and students.

The DOL was the governing body in charge of overseeing the Job Corps program and Defendant's compliance with Job Corps safety and contract provisions. (A-512-13, 862-93). Under its contract with the DOL, Defendant was required to conduct program operations in a setting that was clean, well maintained, and safe. (A-527-28, 872). The DOL had the right to rescind the contract if Defendant breached these provisions. (A-509, 529).

Defendant engaged in an intentional scheme of suppressing safety complaints on campus and to the DOL. Defendant required employees to make complaints only to their direct supervisor, including safety complaints. (A-498-502). Mr. Harmon admitted one purpose of this policy was to prevent employees from complaining to the DOL. (A-522). Defendant told employees, including the Center Director, not to make complaints to the DOL. (A-273-74, 328-29, 501-02). Employees were told on an almost daily basis they were replaceable and there would be consequences if they made complaints over their supervisor's head. (A-321, 324).

Defendant also failed to address the safety complaints it intentionally suppressed, such as complaints that its food was regularly making students sick. (A-275-76, 280-81). It had made drastic cuts to the food budget on campus and ignored complaints students were falling ill from poor food quality. *Id.* Cafeteria staff made complaints, as did the Center Director to corporate. *Id.* The Center Director complained the food was inedible and making students so sick they needed to go to the Wellness Department for treatment. (A-280-81). Defendant ignored these complaints, and the problem was never addressed. (A-281).

Defendant also told staff not to report complaints of mold in the dorms because it could be flagged as an issue by the DOL. (A-328-29). Employees were reprimanded for failing to adhere to this policy. *Id.* The mold was never

10

addressed.  (A-331).  At least one student complained of respiratory issues from

the mold.  *Id.*

Defendant also told the Center Director not to report a student with a

weapon to the DOL.  (A-273-75).  The weapon was a large knife that required

expulsion under DOL rules.  (A-274-75).  Ms. Grangent was told to keep the

student anyway and not complain to the DOL.  (A-274).  Defendant was paid in

relation to the number of students it had on campus.  (A-275).

Defendant also cut the full-time Safety Officer position when it took over

the campus.  (A-281-83).  It did so over the objection of Ms. Grangent, who had

never seen the Safety Officer position combined or eliminated in any of the other

Job Corps she had worked.  (A-282-83).

## C. Verdict and Post-Trial Proceedings

Trial was held from July 26-30, 2021.  The jury returned a verdict against

Defendant for unlawful retaliation in violation of VOSHA and VESTA, and

awarded back pay of $55,305, front pay of $85,638, emotional distress damages of

$75,000, and punitive damages of $3,000,000.  (A-22-26).

Following trial, Defendant filed a Motion for Judgment as a Matter of Law,

or, in the Alternative, for a New Trial.  In denying the Motion for Judgment as a

Matter of Law, the District Court found Defendant had "a corporate culture of

suppressing legitimate complaints" and its "conduct evinced a disregard for the

11

health and safety of its employees and students." (A-28, 52). Notwithstanding, the District Court ordered a retrial on damages, finding the jury erred in its award of lost wages and punitive damages. (A-49-56).

Prior to retrial, Defendant filed a Motion in Limine to exclude evidence admitted at the first trial relating to food and weapon safety complaints, which the District Court granted. (A-666-68, 677). Retrial was held from December 12-16, 2022. The jury returned a verdict awarding $35,000 in back pay, $20,000 in emotional distress damages, and no punitive damages. (A-59).

## SUMMARY OF ARGUMENT

The District Court abused its discretion by overturning the jury's verdict and ordering a new trial on damages. The awards of lost wages and punitive damages were supported by the evidence and did not violate Defendant's due process.

The award of $140,943 in lost wages was supported by evidence showing Plaintiff would have remained employed at NJCC until retirement had he not been terminated, including evidence of his intent, work history, education, skills, and difficulty finding comparable employment.

The award of $3 million in punitive damages was supported by the evidence showing Defendant retaliated against Plaintiff for making safety complaints, and that the retaliation was part of a scheme to suppress safety

12

complaints on campus and to the DOL. Defendant's scheme was financially motivated and involved its top corporate officials. Students and employees were harmed as a result and were at risk of future harm if the conduct was not deterred.

The punitive damage award did not violate Defendant's due process. The award was supported under each *State Farm* guidepost, including serious reprehensibility and risk of further harm if the conduct was not deterred. Comparative case law and the policies of punitive damages supported the size and ratio of the award. Defendant presented no evidence of its finances, further undermining its claim that the award violated its due process.

In the alternative, the District Court abused its discretion by failing to grant remittitur. The jury's awards of lost wages and punitive damages were supported by the evidence and were not the result of passion or prejudice. In the event the awards were excessive, they were not so excessive as to preclude remittitur under the law.

In the alternative, the District Court abused its discretion by excluding evidence at retrial of Defendant's suppression of food safety and weapon complaints. The evidence was relevant to punitive damages, including reprehensibility, deceit, pattern, risk to the health and safety of others, and likelihood of future harm. There was no basis for exclusion, and the District Court contradicted its prior rulings by excluding the evidence at retrial.

13

For these reasons, Plaintiff appeals the District Court's decision granting a new trial on damages and respectfully requests that the jury's verdict at trial be upheld. In the alternative, Plaintiff respectfully requests remittitur be ordered in an amount determined by this Court. In the alternative, Plaintiff respectfully requests a new trial.

## ARGUMENT

## I. THE DISTRICT COURT ABUSED ITS DISCRETION BY ORDERING A NEW TRIAL ON DAMAGES

The District Court ordered a new trial on damages because it held the jury's awards of lost wages and punitive damages were unsupported by the evidence. (A-49-56). For the following reasons, this decision was based on an erroneous view of the evidence and law and cannot be located within the range of permissible decisions.

### A. STANDARD OF REVIEW

"A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions." *Sims v. Blot,* 534 F.3d 117, 132 (2d Cir. 2008) (internal citations, alterations, and quotation marks omitted). "The district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously

erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988).

The Second Circuit reviews the District Court's grant of a new trial under an abuse of discretion standard. *Mirlis v. Greer*, 952 F.3d 36, 48 (2d Cir. 2020). With respect to punitive damages, "courts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436, 121 S. Ct. 1678, 1685–86, 149 L. Ed. 2d 674 (2001).

## B. SUFFICIENT EVIDENCE SUPPORTED THE JURY'S AWARD OF LOST WAGES AND THERE WAS NO BASIS FOR THE AWARD TO BE OVERTURNED

The District Court held the jury's award of $140,943 in lost wages was excessive and required a new trial. (A-49-51). The District Court found "no rational view of the evidence supports a conclusion that Plaintiff would have worked at NJCC until he was seventy." (A-51). This finding was an abuse of discretion for the following reasons.

### 1. Sufficient evidence supported the jury's finding that Plaintiff would have remained employed at NJCC until retirement had he not been terminated.

The following evidence supported the jury's finding that Plaintiff would have remained employed at NJCC until retirement absent the unlawful termination.

15

Plaintiff went to college later in life to obtain a degree in human services. (A-64, 163-68, 203). He testified that it was important to him to work in a position using his human services degree. (A-168).

Plaintiff was employed at NJCC for approximately five years prior to his termination. (A-66-68, 704-07). He worked as a full-time Culinary Arts Instructor from 2013-15, as a part-time Recreational Specialist from 2015 to 2018, and as a full-time Residential Counselor in 2018. *Id.* He enjoyed working at NJCC and was good at his job. (A-65, 75). A coworker also testified Plaintiff was good at his job, good with the students, and was a good co-worker. (A-140).

Plaintiff's position was the highest paying of his career by over $10,000 per year. (A-217, 346, 845). He was fifty-seven at the time of trial and testified he planned to work until he was seventy. (A-64, 168). He lived near NJCC and had worked in the area for many years. (A-64-67, 704-07).

Plaintiff was unable to find comparable employment after his termination. (A-169). Despite diligent search, he did not find any human services jobs in Vermont that paid as much as at NJCC. (A-145). He searched for comparable employment even when employed at other jobs, and he submitted in excess of 300 job applications since his termination. (A-146). He spent at least a half hour per day, three to four days a week, on job applications, for an average of two hours per week and an excess of 100 hours per year since his termination. (A-146-47). At

16

the time of trial, he was working full time as a kitchen supervisor earning $25 per hour, the most he had earned since his termination.  (A-161, 167).

This aforementioned evidence was more than sufficient for the jury to find Plaintiff would have continued working at NJCC until retirement.  This is especially true under a preponderance of the evidence standard where the jury must determine the most likely age Plaintiff would have remained, absent the retaliation.  *See, e.g., Anderson v. Metro-N. Commuter R.R.*, 493 F. App'x 149, 152 (2d Cir. 2012) (finding jury's determination of ten years of future lost wages was supported by the evidence).

Just as in *Anderson*, the jury's determination of lost wages had ample support.  Plaintiff had shown a strong interest in NJCC and his profession, he good at his job, the job was the best of his career, and the there was a lack of comparable employment in the area.  All of this evidence was sufficient for the jury to find Plaintiff would have remained employed at NJCC until his retirement absent the unlawful termination.

## 2. The District Court's reasons for overturning the jury's award of lost wages were erroneous.

The District Court cited certain reasons why it believed the jury's award of lost wages was excessive.  For the following reasons, the District Court's reasoning was erroneous.

17

### i.     *Terminations and resignations of other employees at NJCC*

The District Court cited Defendant's argument that "turnover of RCs at NJCC was rampant . . .."  (A-50).

First, the sample size of Residential Counselors proffered by Defendant was irrelevant because it arbitrarily included only those who were hired at the same time Plaintiff was employed.  (A-945-46).  To be at all relevant to Defendant's claim that turnover at NJCC was rampant, the sample size would have needed to include a much larger sample size.  Furthermore, even out of the small sample size of Residential Counselors hired during Plaintiff's employment, some were still employed, undermining Defendant's contention.  *Id.*

Second, neither the ages, educational histories, nor work histories of this small sample of Residential Counselors were submitted as evidence by Defendant. *Id.*  Plaintiff was fifty-seven at the time of trial, had obtained a degree in human services, had worked at NJCC since 2013, and the position was the highest paying position of his career.  Therefore, not only was the sample size unreasonably small, there was no evidence those Residential Counselors had similar circumstances to Plaintiff.

Third, Plaintiff's three-year job search following his termination demonstrated no comparable jobs existed in the geographic area, which further supported the jury finding he would not have voluntarily left the position.

Accordingly, the jury properly disregarded Defendant's argument, and the District Court erred in adopting it as a reason to grant a new trial.

## ii.    *Plaintiff's request for reassignment*

The District Court found Plaintiff "was sufficiently dissatisfied with his role as RC to ask for reassignment prior to his termination." (A-51). For the following reasons, Plaintiff's reassignment request was a result of Defendant's retaliation and in no way contradicted the jury's award.

First, Plaintiff's request for reassignment was a result of Defendant's retaliation. He made his request for reassignment on Friday morning. (A-770, 772). This was after Defendant had already begun its retaliation.[2] The entire reason Plaintiff requested reassignment was because Defendant had ignored his safety complaints. (A-130). Defendant ignored Plaintiff's attempts to speak throughout the entire week, and thereafter falsely claimed he missed three days of work and needed to be terminated. Ms. Grangent, Ms. Trybendis, Ms. Brookes, and the corporate office all failed to respond to Plaintiff's safety complaints. (A-122-23, 131-32). This failure to communicate with Plaintiff during the week was

---

[2] Ms. Grangent told corporate officers, including Mr. Harmon, about Plaintiff's safety complaints on a conference call during the week prior to his termination. (A-302-03). Upon hearing about Plaintiff's safety complaints on Tuesday, Ms. Mobley immediately communicated her desire to terminate his employment. (A-251). Mr. Harmon testified he had two or three conversations on Thursday and Friday about terminating Plaintiff. (A-533).

19

part of Defendant's retaliation, suppression of complaints, and plan to terminate his employment, and it led to Plaintiff requesting reassignment. The jury thus properly disregarded the request for reassignment since it would not have occurred except for Defendant's retaliation.

Second, even if it were considered, the reassignment request still did not negate the likelihood of continued employment. Plaintiff did not quit, he only asked "for the consideration of job reassignment out of the Department of Independent Living." (A-772). The District Court found "Plaintiff asked for reassignment to a lower-paying position," but this finding was erroneous. (A-50). Plaintiff made no such request to a lower-paying position, he simply requested reassignment. (A-130, 772). Moreover, numerous jobs existed for reassignment that paid as much or more than his position. (A-857). Lastly, Ms. Brookes testified it was unlikely reassignment would have even been granted, and thus, Plaintiff would have remained in his position. (A-448).

Based on these facts, the jury was within reason to find Plaintiff would not have requested reassignment absent Defendant's retaliation, and, even if he had, the request would have been denied or he would have been reassigned to a similarly paid position. Accordingly, the District Court erred in finding Plaintiff's request for reassignment somehow negated his lost wages.

20

### iii. Plaintiff's work history

The District Court found "nothing in [Plaintiff's] work history either before or after his employment with Defendant supported a conclusion that he would have remained in the same position throughout his career." (A-51). This reasoning was erroneous for the following reasons.

Plaintiff's prior work history in no way contradicted the jury's finding that he was likely to remain employed at NJCC until his retirement. Plaintiff had shown strong interest in working at NJCC and had been employed there full or part time since 2013. It was the highest paying job of his career and a perfect position based on his human services degree, which he had obtained by going to school in his thirties. He enjoyed working at NJCC, was good at his job, was fifty-seven at the time of trial and planned to work until he was seventy. The jury was reasonable to determine these facts made it more likely than not he would have remained employed at NJCC until retirement, had he not been terminated.

Plaintiff's employment following his termination was also an erroneous basis for the District Court to overturn the jury's award. While Plaintiff changed jobs numerous times after his termination until trial, none of those jobs were comparable to his position at NJCC. They paid substantially less income and benefits and were for the most part not in his chosen field. (A-147-48, 151-55,

160-62).[3]  Therefore, Plaintiff's departure from those positions in no way

contradicted the jury's finding.  On the contrary, the changes in jobs after

termination were part of Plaintiff's diligent efforts to mitigate his damages and

obtain comparable employment.  His difficulty in finding a comparable job, despite

extreme efforts, was even more reason for the jury to find he would have continued

to work at NJCC absent the unlawful termination.  *See Luca v. Cnty. of Nassau*,

344 F. App'x 637, 641 (2d Cir. 2009) ("We have repeatedly upheld awards of front

pay through retirement where the record contained evidence sufficient to find that a

plaintiff had 'no reasonable prospect of obtaining comparable alternative

employment' and to calculate the resulting salary disparity.") (quoting *Padilla v.*

*Metro–North Commuter R.R.*, 92 F.3d 117, 126 (2d Cir. 1996)).

For these reasons, the District Court erred in overturning the jury's award of

lost wages due to Plaintiff's work history.

---

[3] The positions Plaintiff worked following his termination were: (a) substitute teacher; (b) in-house respite care; (c) seasonal worker; (d) manager at restaurant ($700 per week); (e) disc fabricator ($15.50-$17.00 per hour) (f) line cook ($17.00 per hour); (g) line cook ($15.50 per hour); (h) line expediter ($19.00 per hour); (i) counselor ($38.000 per year); (j) carpenter ($18.00 per hour); (k) solar panel installation technician ($20.00 per hour); (l) line cook ($22.00 per hour); (m) line cook ($20.00 per hour); and (n) kitchen supervisor ($25.00 per hour).  (A-147-48, 151-55, 160-62).

> iv.    *Plaintiff's mitigation of damages*

The District Court next noted, "[t]here was also evidence that Plaintiff failed to mitigate his damages by resigning from two positions that would have reduced his damages."  (A-51).  This finding was erroneous for the following reasons.

The two positions Plaintiff quit in the three years after his termination were Donuts of Rutland and Global Foundries.  (A-173-76).  The jury was reasonable to disregard these resignations because the jobs were in no way comparable in duties, pay, or benefits to Plaintiff's position with Defendant.  *See, e.g., Bergerson v. New York State Office of Mental Health, Cent. New York Psychiatric Ctr.*, 526 Fed.Appx. 109, 111 (2d Cir. 2013) ("An employee "need not go into another line of work, accept a demotion, or take a demeaning position . . . and a voluntary quit does not toll the back pay period when it is motivated by unreasonable working conditions or an earnest search for better employment.") (internal quotations and citations omitted).

Plaintiff earned approximately $700 per week at Donuts of Rutland and approximately $17 per hour at Global Foundries.  (A-153-54, 173-75).  These earnings paled in comparison to the $53,300 annual salary he would have been earning at NJCC.  (A-346, 460, 709).  The two positions were also not in the same line of work or his chosen field of human services.  *See In re Lilly*, 173 Vt. 591,

593–94, 795 A.2d 1163 (2002) ("The general rule is that suitable employment must be substantially equivalent to the position lost and suitable to a person's background and experience.").

Most importantly, even if these positions were somehow comparable, Plaintiff's resignations actually helped mitigate his damages because he replaced them with higher paying positions. Plaintiff earned $38,743 in 2018, $38,802 in 2019, and $42,150 in 2020. (A-151, 155, 161, 845). These annual incomes were all greater than what he would have earned annually at Donuts of Rutland ($700 per week) and Global Foundries ($17 per hour). Therefore, the jury was reasonable to find he did not fail to mitigate his damages. His decision to quit those positions increased his annual income and, at the time of trial, he was earning $25.00 per hour as a kitchen supervisor. (A-162).

For these reasons, Plaintiff's resignation from Donuts of Rutland and Global Foundries following his termination was an erroneous basis for the District Court to grant a new trial.

### v. *Plaintiff's expert did not make any improper assumptions*

The District Court found Plaintiff's expert "made assumptions about raises and the duration of Plaintiff's employment that were inconsistent with [Defendant's] contract" to run NJCC. (A-50-51). This was erroneous for the following reasons.

24

First, the duration of Defendant's contract with NJCC in no way contradicted the jury's finding. Defendant's contract to oversee NJCC was a five-year contract, after which Defendant could rebid the contract. (A-529-30). At the time of trial, Defendant had been in business for over twenty-seven years and oversaw nine Job Corps. (A-379-80, 525-26). Thus, the jury could have found it more likely than not that Defendant would continue to oversee NJCC.

Most importantly, the DOL contract required that new contractors rehire existing employees, such as Plaintiff, under the right of first refusal. (A-588-89). Therefore, Plaintiff would have been able to continue working at NJCC, even in the event Defendant ceased being the contractor at some point prior to Plaintiff's retirement. On each of these bases, the jury was more than reasonable to disregard Defendant's claim that its contract somehow precluded Plaintiff's continued employment.

Second, Plaintiff's expert's projection of 2.5% wage increases was not contradicted by Defendant's contract. Plaintiff's expert testified raises were likely, and Defendant's own Salary & Wage Structure listed Plaintiff's position as having a maximum salary of $59,975—much more than the $53,330 salary he was earning at the time of his termination. (A-359, 857). The jury was reasonable to credit Plaintiff's expert's testimony that it was probable Plaintiff would receive raises over time, whether during or in between contracts, because Defendant

25

would need to provide raises to remain competitive in securing employees.  (A-359).  The jury could have also based this finding on its own collective experience in the marketplace, common sense understanding that wages increase over time, and the fact the employment was under renewable federal contracts.  The jury crediting Plaintiff's expert's testimony on this issue is eminently more reasonable than Defendant's contention that no raises would have occurred in Plaintiff's position from now until his retirement.

For these reasons, the District Court abused its discretion in overturning the jury's award on this basis.

### vi.    The jury's award of lost wages was only $4,227 more than Plaintiff requested

Lastly, the District Court found the jury's awards of back and front pay "were more than Plaintiff requested, which, alone, reflects a 'seriously erroneous result.'"  (A-51).  This finding was erroneous for the following reasons.

First, the jury awarded back pay of $55,305 and front pay of $85,638, for a total of $140,943.  This award was only $4,227 more than Plaintiff's expert's estimate of $136,716.  (A-350-51).  The Second Circuit has held that such a minor difference is an erroneous basis to overturn the jury's award.  *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188-90 (2d Cir. 1992) ("While the jury's award of $310,000 in back pay was slightly higher than the plaintiff's expert's calculation of $266,106, it does not shock the conscience, nor does it deviate

26

substantially from what would be reasonable compensation; thus, there is no basis for us to disturb that award."); *and Anderson*, 493 F. App'x at 152 (award should not be set aside "merely on the grounds that the jury made a minor computational error."). Additionally, much larger awards of back pay and front pay are regularly issued and upheld. *See, e.g., Broadnax v. City of New Haven*, 141 F. App'x 18 (2d Cir. 2005) (affirming $927,237.67 in front pay for 42 year-old employee until retirement); *Luca*, 344 F. App'x at 641 (upholding $604,589 in front pay through retirement); *and Tyler*, 958 F.2d at 1179 (affirming $310,000 in back pay and $667,000 in front pay for 17 years until age of retirement).

Second, even if such a minor difference could warrant a retrial if excessive, the jury's estimate was supported by the evidence and was not excessive. The $4,227 difference could have been the result of the jury projecting a slightly higher salary growth rate than the 2.5% Plaintiff's expert projected. (A-334-35, 346-47). This would have been a reasonable finding because Plaintiff's expert testified the 2.5% growth rate he used was a conservative estimate. *See, e.g., In re Vivendi Universal, S.A. Sec. Litig.,* 765 F. Supp. 2d 512, 575–76 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) ("[I]t is well-established that the computation of damages is a quintessential fact issue for the jury, and that a jury need not accept an expert's damage calculations wholesale.").

The jury also could have estimated a higher growth rate because Plaintiff's expert testified raises were likely, and Defendant's own salary charts listed Plaintiff's position as having a maximum salary of $59,975. (A-359, 857). Lastly, the jury was also within its purview to project a different growth rate based on its collective experience with salary increases. *See Havill v. Woodstock Soapstone Co.*, 2007 VT 17, ¶ 6, 181 Vt. 577, 924 A.2d 6 (2007) (calculation of lost wages "inherently speculative" and "[a] reasonable estimate based on the evidence is all the law requires . . ..").

For each of these reasons, the District Court abused its discretion in overturning the jury's award of lost wages. The jury's award was supported by the evidence, and no reasons set forth by the District Court justified overturning the award.

## C. SUFFICIENT EVIDENCE SUPPORTED THE JURY'S AWARD OF PUNITIVE DAMAGES AND THERE WAS NO BASIS FOR THE AWARD TO BE OVERTURNED

The District Court held a retrial on punitive damages was necessary because the jury's award violated Defendant's due process. (A-56). For the following reasons, the District Court abused its discretion in overturning the jury's punitive damage award.

1. **Sufficient evidence supported the jury's award of punitive damages under the *State Farm* guideposts.**

"[P]unitive damage awards are largely within the jury's discretion . . .." *Glidden v. Skinner*, 142 Vt. 644, 644–48, 458 A.2d 1142 (1983). An award of punitive damages should be overturned "only if it is 'manifestly and grossly excessive.'" *Sweet v. Roy*, 173 Vt. 418, 446–47, 801 A.2d 694, 715 (2002) (quoting *Crump v. P & C Food Markets, Inc.,* 154 Vt. 284, 298, 576 A.2d 441, 450 (1990)).

"Punitive-damage awards are subject to constitutional scrutiny because due process demands 'that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.'" *Shahi v. Madden*, 2008 VT 25, ¶ 25, 183 Vt. 320, 949 A.2d 1022 (2008) (quoting *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). "In *State Farm,* the Court directed courts to consider three guideposts when reviewing punitive damage awards:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Id.* (quoting *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)).

29

For the following reasons, the punitive damage award did not shock the conscience, weigh against the evidence, or violate Defendant's due process.

### i.  *Guidepost 1*

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* (quoting *State Farm*, 538 U.S. at 419).  "Reprehensibility is to be determined by reference to whether: [1] 'the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.'"  *Id.* at ¶ 26 (quoting *State Farm*, 538 U.S. at 419).  One of these factors may be sufficient.  *See, e.g., Eisenberg v. Reid*, 74 F. App'x 110, 111–13 (2d Cir. 2003); *and Trickey v. Kaman Indus. Techs. Corp.*, 705 F.3d 788, 803 (8th Cir. 2013).

For the following reasons, Defendant's conduct was reprehensible to a degree justifying the jury's award.  At least four out of the five reprehensibility factors were present.  Most notably, Defendant engaged in a scheme to suppress safety complaints that risked the health and safety of others and was intentional and deceitful in its conduct.

### *a) Harm caused was physical as opposed to economic*

Plaintiff's VESTA complaint related to Defendant's unlawful sick leave policy, which required employees to work sick if they did not find a replacement. The harm caused by Defendant's unlawful sick leave policy was physical in nature, as was its scheme and pattern of suppressing safety complaints, and they impacted the health and safety of others for the reasons to be discussed in § (I)(C)(1)(i)(b) *infra*.

Moreover, even if the harm from Defendant's conduct were solely economic, "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct ... can warrant a substantial penalty." *Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 87 (2d Cir. 2007) (quoting *Gore,* 517 U.S. at 576).

### *b) Indifference and reckless disregard for the health or safety of others*

This reprehensibility factor is the most important factor because it affects the most people and involves issues of health and safety. The following evidence demonstrated Defendant was indifferent and recklessly disregarded the health and safety of others.

Defendant retaliated against Plaintiff for complaining about its unlawful sick leave policy of requiring employees to find replacements before taking sick leave. This unlawful policy was corroborated by other employees, including the

Center Director. (A-228-29, 251, 321-24). The policy risked the health of employees and the students with whom they worked in close proximity. (A-38, 103-04).

To make matters worse, Defendant's retaliation against Plaintiff was part of a larger pattern of suppressing safety complaints on campus and to the DOL. This made Defendant's conduct even more reprehensible, dangerous, and in need of deterrence. *See Carpentier v. Tuthill*, 2013 VT 91, ¶ 12, 195 Vt. 52, 86 A.3d 1006 (2013) ("'[T]he existence and frequency of similar past conduct' is a relevant consideration in assessing punitive damages.") (quoting *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 462 n. 28, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)); *Kennedy v. Supreme Forest Products, Inc.*, 761 F. App'x 72, 74 (2d Cir. 2019) ("The District Court aligned with Kennedy's view and emphasized SFP's greed and repeat offenses—precisely those characteristics highlighted as reprehensible in *State Farm*."); *and Weidler v. Big J Enterprises, Inc.*, 1998-NMCA-021, ¶ 47, 124 N.M. 591, 603–04, 953 P.2d 1089, 1101–02 ("Here, where there was evidence of a pattern of threatening employees with their jobs over the raising of safety concerns, the jury could reasonably conclude Big J was engaging in particularly reprehensible conduct.").

Defendant directed its employees not to make complaints to the DOL. (A-498-502). The DOL was the governing body with oversight of Job Corps and

32

Defendant's compliance with workplace laws. (A-529). Defendant had financial motive to suppress complaints to the DOL because its business relied on one customer, the DOL. (A-505-06, 512-13). Under its contract with the DOL, Defendant was required to "conduct program operations in a setting that is clean, well maintained, and safe." (A-527-29, 872). The DOL had the right to rescind the contract if Defendant breached this provision. (A-509, 529).

Defendant also required that its employees only complain to their direct supervisor, including safety complaints. (A-498-502). Defendant's Vice President admitted a purpose of this policy was to prevent employees from complaining to the DOL. (A-522). Employees were told on an almost daily basis that they were replaceable and there would be consequences if they went over their supervisor's head with complaints. (A-321, 324).

Defendant's scheme to suppress safety complaints risked the health and safety of both employees and students. The DOL understandably required that Defendant maintain a safe environment on campus. (A-527-29, 872). Many potential safety issues existed because students lived full-time on campus and engaged in vocational training including forestry, welding, culinary arts, and auto repair. (A-505). Employees at NJCC included nurses, cafeteria staff, counselors, teachers, and vocational instructors, and it was essential that these employees felt free to report any dangers to the safety of the students. (A-506). Defendant

33

endangered the safety of students by prohibiting these employees from complaining about safety issues to the DOL or anyone other than their immediate supervisor. This was a dangerous policy for numerous reasons, including that the DOL oversaw Defendant's safety compliance, an immediate supervisor might not be available or address a safety issue, the policy made it less likely employees would make complaints, and it threatened retaliation if they did.

In addition to this evidence, numerous specific examples were presented at trial showing Defendant's suppression of safety complaints and the resulting harm to the health and safety of students and employees.

Defendant made drastic cuts to the food budget on campus and ignored complaints that students were becoming sick from poor food quality. (A-275-76, 280-81). The top cafeteria staff made these complaints, as did the Center Director to corporate. *Id.* The Center Director complained the food was inedible and making students so sick they needed to go to the Wellness Department for treatment. (A-280-81). Defendant ignored these complaints, and the problem was never addressed. (A-281).

Defendant regularly failed to provide cleaning supplies the students needed, despite complaints from Plaintiff and other employees. (A-227, 245-46, 325-27, 772). Employees were forced to buy cleaning supplies for the students themselves with their own money because Defendant failed to address the lack of cleaning

supplies.  (A-327).  The dorms were dirty and in deplorable condition.  (A-327-28).

Defendant directed employees not to complain about mold in the dorms because it could be flagged as an issue by the DOL.  (A-328-29).  It reprimanded employees for failing to adhere to this policy.  (A-330).  The mold was never addressed and at least one student complained of having respiratory issues from the mold.  (A-331).

Defendant ordered the Center Director not to report a student with a weapon to the DOL.  (A-273-75).  The weapon was a large knife that required expulsion under DOL rules.  (A-274-75).  Despite the danger, Defendant told the Center Director to keep the student and not complain to the DOL.  (A-274).  Defendant was paid in relation to the number of students it had on campus.  (A-275).

Defendant cut the full-time Safety Officer position when it overtook the campus.  (A-281-83).   It did so over the objection of the Center Director, who had never seen the Safety Officer position cut or eliminated in any of the other Job Corps she had worked.  (A-282-83).

All of this evidence supported the jury finding Defendant had a scheme and pattern of suppressing complaints to the DOL, and that it suppressed serious safety complaints as part of this scheme.  Not only did Defendant direct its

employees not to make complaints, it ignored and suppressed the safety complaints that were made, including complaints of mold and substandard food making students sick, a lack of necessary cleaning supplies, unsanitary dorm conditions, violation of DOL rules regarding weapons, and the unlawful sick leave policy. This suppression caused direct harm to the students and risked further harm by not addressing the issues and discouraging employees from making such complaints in the future.

For these reasons, the evidence showed Defendant had a pattern of suppressing safety complaints that risked the health and safety of students and employees, and its unlawful retaliation against Plaintiff was a part of that scheme.

### c) *The targets of the conduct had financial vulnerability*

Plaintiff suffered financial vulnerability as a result of the retaliation. He needed to apply for unemployment multiple times in the three years following his termination. (A-166). He suffered a loss in his credit rating. (A-164). He was unable to pay rent on time and was behind in rent by two months at the time of trial. (A-163-64). He performed work for his landlords to pay rent. (A-164-65). He had to sell personal and family items to pay his bills. (A-165).

In addition, the students at NJCC were also financially vulnerable and the targets of Defendant's conduct. They attended the Job Corps program in order to gain their GED and vocational skills. (A-504-05). They lived on campus away

from their families and were sixteen to twenty-four years old.  (A-243-44, 504-05).  They were endangered by Defendant's unlawful sick leave policy, retaliation against Plaintiff, pattern of suppressing safety complaints, and failure to address complaints that endangered the students' health and safety.

### d) *The conduct involved repeated actions and was not an isolated incident*

Defendant's retaliation against Plaintiff and its intentional suppression of safety complaints involved repeated actions and were not an isolated incident.

First, Defendant engaged in repeated trickery and deceit in its retaliation against Plaintiff for the reasons set forth in the following subsection § I(C)(1)(i)(e) *infra*.

Second, as previously set forth in § I(C)(1)(i)(b) *supra*, Defendant's pattern of suppressing safety complaints involving repeated actions, including an ongoing policy directing employees not to make complaints to the DOL, not to make complaints to anyone except their direct supervisor, and threatening termination if they made such complaints.  Defendant also suppressed employee complaints regarding student illnesses from substandard food and mold, deplorable dorm conditions, lack of cleaning supplies, weapons, and the unlawful sick leave policy.

For these reasons, Defendant's retaliation against Plaintiff involved repeated actions and was part of a scheme to suppress complaints to the DOL about health and safety violations on campus.

37

### e) *The harm was the result of intentional malice, trickery, and deceit*

Defendant engaged in intentional malice, trickery, and deceit in its unlawful retaliation against Plaintiff.

First, Defendant intentionally disregarded Plaintiff's rights when it terminated him for raising safety complaints. The retaliation was also part of a pattern of suppression of safety complaints for financial gain. (A-273-76, 280-81, 310, 321-25, 328-29, 331, 501-02). For these reasons, intentional malice was involved. *See DeYoung v. Ruggiero,* 185 Vt. 267, 971 A.2d 627, 2009 VT 9, ¶ 27; *and Shortle v. Central Vermont Public Service Corp.,* 137 Vt. 32, 33, 399 A.2d 517, 518 (1979).

Second, there was substantial evidence of trickery and deceit. Defendant's alleged reason for termination was proven false at trial. Defendant claimed it terminated Plaintiff for leaving work early on Monday without notice and missing Tuesday and Wednesday, thereby missing three days without notice. (A-774). Each of these allegations was untrue. On Monday, Plaintiff worked his entire shift. (A-76, 138). On Tuesday, he left work early but notified the Center Director. (A-115-16, 139). On Wednesday, he had a scheduled day off and therefore did not miss work. (A-140). The weekly schedule also directly contradicted Defendant's reason for termination. (A-73, 767).

38

The decisionmakers knew the reason was false at the time of the termination. The jury could have reasonably found Defendant's Vice President and HR Director both lied at trial when they testified they were unaware the reason for termination was false at the time of termination. (A-417, 540). Ms. Grangent told Ms. Brookes, Mr. Harmon, and corporate officers prior to the termination that Plaintiff had not missed three days of work as alleged. (A-40, 253-54, 272-73, 305-06).

Moreover, on Friday prior to the termination, Mr. Harmon acknowledged Plaintiff needed to be paid for Tuesday because he showed up to work. (A-534-35). Mr. Harmon also received an email from Ms. Brookes prior to the termination, in which she made clear Plaintiff had also worked Monday and Tuesday and needed his "punches" approved through Tuesday. (A-418-20, 831). They also had access to Plaintiff's timecards and weekly schedule that showed he was not scheduled to work Wednesday. (A-73, 417, 427-29, 538, 767, 836). All of these facts directly contradicted Mr. Harmon and Ms. Brookes' testimony that they did not know the reason for termination was false.

Defendant was also deceitful about its knowledge of Plaintiff's safety complaints. Mr. Harmon and Ms. Brookes testified at trial they had been unaware of Plaintiff's safety complaints prior to the termination. (A-397, 400, 521, 539). The following evidence supported the jury finding Mr. Harmon and Ms. Brookes

39

were lying in an attempt to cover up the retaliation, and that they indeed knew about the safety complaints prior to the termination.

Ms. Grangent told Ms. Brookes, Mr. Harmon, and other corporate officers about Plaintiff's safety complaints prior to the termination. (A-40, 299, 303-03). Ms. Brookes was also forwarded Plaintiff's complaint letter prior to the termination. (A-402-03, 826). In addition, Ms. Brookes wrote an email prior to the termination referencing the fact Plaintiff had written "a simple blurb requesting re-assignment." (A-414-15, 842). This request for reassignment was in the same one-page letter Plaintiff enumerated his safety complaints. (A-772). Ms. Trybendis also testified she told Ms. Brookes on Wednesday about Plaintiff's complaints, and another employee, Ms. Howell testified she was told by Ms. Brookes about Plaintiff's complaints. (A-319-20, 488-89).

For each of these reasons, Defendant committed a large degree of malice, trickery and deceit in its retaliation, scheme to suppress safety complaints, and attempts to cover up its unlawful conduct.

### ii.    *Guideposts 2 and 3*

The second and third *State Farm* guideposts are "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award," and "the difference between the punitive damages awarded by the jury and the

40

civil penalties authorized or imposed in comparable cases." *Shahi*, 2008 VT 25 at ¶ 25 (quoting *Gore,* 517 U.S. at 574).

Under Vermont law, "the amount of the punitive damages need bear no particular relationship to the amount of compensatory damages." *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 298, 576 A.2d 441, 449 (1990); *see also Sweet v. Roy*, 173 Vt. 418, 447, 801 A.2d 694, 715 (2002). "It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused . . . as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." *TXO Prod. Corp.*, 509 U.S. at 460, 472 (emphasis in original).

"A higher ratio may also be justified in cases in which the injury is hard to detect . . .." *Gore*, 517 U.S. at 582. "[A] jury imposing a punitive damages award must make a qualitative assessment based on a host of facts and circumstances unique to the particular case before it." *TXO Prod. Corp.*, 509 U.S. at 457.

In the present case, the jury awarded $3 million in punitive damages at a ratio of approximately 14:1 to compensatory damages. For the following reasons, federal and state law support the size and ratio of the verdict.

### a) Federal case law

Federal case law supports the size and ratio of the punitive damages. In *Flannigan v. Vulcan Power Group., LLC*, the Second Circuit upheld punitive

damages of $900,000 in a 3:1 ratio to compensatory damages. 642 F. App'x 46, 53–54 (2d Cir. 2016). The conduct at issue in *Flannigan* was the employer's retaliation against the employee for suing for unpaid commission. *Id.* at 49. While this retaliation was reprehensible, it did not involve any issues of health and safety, pattern of suppression, or risk of future harm to others. Thus, the punitive award in the present case is reasonable in its amount and ratio when compared to *Flannigan*.

In *Eisenberg v. Reid*, the Second Circuit upheld a punitive award of $675,000 in a 6.75:1 ratio for fraud and conversion. 74 F. App'x at 111–13. The reprehensibility related to the defendant "knowingly and repeatedly engag[ing] in trickery and deceit." *Id.* at 112. *Eisenberg* and the present case both involved intentional trickery and deceit. However, in contrast to *Eisenberg*, at least four out of the five reprehensibility factors applied in this case, and to a large degree. Therefore, *Eisenberg* supports the punitive award issued in this case.

The cases cited by the Second Circuit in *Eisenberg* are equally applicable:

*See Am. Fin. Servs. Group v. Treasure Bay Gaming & Resorts,* No. 99CIV.1068NT, 2000 WL 815894, at *16 (S.D.N.Y. June 23, 2000) (awarding $5,000,000 in punitive damages in an action that resulted in compensatory damages of $493,500, based on a party's repeated and intentional misrepresentations as to its financial condition); *and Sanders v. Gardner,* 7 F.Supp.2d 151, 156, 179 (E.D.N.Y.1998) (upholding an arbitrator's punitive damage award of $10,000,000 for repeated and intentional misrepresentation by a brokerage that resulted in a compensatory damage award of $184,583).

42

*Id.* at 112–13.  These cases add further support to the amount and ratio of punitive damages in the present case.

Other federal cases have held similarly.  *See, e.g., Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1044 (9th Cir. 2003) ($2.6 million punitive damages at 7:1 ratio for employment discrimination); *Jeffries v. Wal-Mart Stores, Inc.*, 15 F. App'x 252, 264-66 (6th Cir. 2001) (50:1 ratio for retaliatory termination); *Bell v. O'Reilly Auto Enterprises, LLC*, No. 1:16-CV-00501-JDL, 2022 WL 4016824, at *22-25, 30 (D. Me. Sept. 2, 2022) ($750,000 punitive damages at 6.41:1 ratio for failure to accommodate); *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 663 (N.D. Ill. 2019) ($3 million punitive damages at 6:1 ratio for consumer fraud); *Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140, 165 (2d Cir. 2014) ($2.64 million in punitive damages for employment discrimination); *and Hammer v. Residential Credit Solutions, Inc.*, No. 13 C 6397, 2015 WL 7776807, at *1, 48 (N.D. Ill. Dec. 3, 2015) ($1.5 million punitive damages for loan servicing violations).  The punitive damages issued by the jury in this case are well within the range of these prior awards when viewing the reprehensibility of conduct and risk of future harm.

Finally, in *TXO Production Corp. v. Alliance Resources Corp.*, the Supreme Court upheld punitive damages of $10 million in a 526:1 ratio to compensatory damages of $19,000 for slander of title.  509 U.S. 443, 460, 113 S. Ct. 2711, 125

43

L. Ed. 2d 366 (1993). The Supreme Court held "in light of the amount of money potentially at stake, the bad faith of petitioner, the fact that the scheme employed in this case was part of a larger pattern of fraud, trickery and deceit, and petitioner's wealth, we are not persuaded that the award was so 'grossly excessive' as to be beyond the power of the State to allow." *Id.* at 462.

The case at bar appears to have even greater evidence of deceit, risk to health and safety, and financial vulnerability than in *TXO*. The potential harm from Defendant's conduct related to the health and safety of others, making the conduct even more reprehensible than the financial and property issues in *TXO*. Similar to *TXO*, the present case also involved the risk of continuing future harm to others. *Id.* at 460, 472 ("It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred."); (". . . today we decide that a *10* –to–1 ratio between punitive damages and *the potential harm of petitioner's conduct* passes muster—calculating that potential harm, very generously, to be more than *50* times the $19,000 in actual damages that respondents suffered . . ..") (emphasis in original).

As discussed in *TXO*, the potential harm of Defendant's pattern of suppression, if not deterred, was significant, including continued retaliations,

44

suppression of safety complaints, and ongoing safety violations risking the health of a large number of employees and students.  Given Defendant's pattern of conduct and the involvement of its top corporate officials, the jury was reasonable to determine strong deterrence was necessary.  Preventing just one other retaliatory termination by Defendant in the future would bring the ratio to 7:1 between actual and potential harm to punitive damages, which the Supreme Court in *TXO* opined to be appropriate at least up to a 10:1 ratio.  *Id.* at 472.  In addition, when including all of the aforementioned potential harm to employees and students from Defendant's conduct, the ratio would appear to be 1:1 or lower.

The framework set forth in *TXO* fully supports the jury's finding that substantial punitive damages are justified when an unlawful retaliation is part of an intentional scheme to suppress safety complaints that harms others and risks further harm if not deterred.

**b) Vermont case law**

Vermont case law also supports the size and ratio of the punitive damages. In *Cooper v. Cooper*, punitive damages of $239,000 were upheld at a 12:1 ratio for a fiduciary's interference with a beneficiary's property rights.  173 Vt. 1, 4, 14-15, 783 A.2d 430, 434, 441-42 (2001).  In *Sweet v. Roy*, punitive damages of $100,000 were upheld at a 10:1 ratio in the case of a self-help eviction.  173 Vt. 418, 801 A.2d 694, 700, 714-15 (2002).  In *Greenmoss Builders, Inc. v. Dun &*

*Bradstreet, Inc.*, punitive damages of $300,000 were upheld at a 6:1 ratio for

defamation by a creditor. 49 Vt. 365, 366, 543 A.2d 1320, 1321 (1988). In *Shahi*

*v. Madden*, punitive damages of $1 million were upheld at a 2:1 ratio against a

neighbor for harassment based on sectarian and racial bias. 2008 VT 25 at ¶¶ 26-

28.

The present case appears to have involved some of the most egregious

conduct by an employer in Vermont with the most need for deterrence. No other

case involved an employer responsible for young students violating safety laws,

intentionally suppressing safety complaints, and endangering the health and safety

of employees and students.

Other states have also upheld large ratios in employment cases. *See, e.g.,*

*Lynn v. TNT Logistics N. Am. Inc.*, 275 S.W.3d 304, 310 (Mo. App. W.D. 2008)

($3.75 million punitive damages at 75:1 ratio in compensatory damages for sexual

harassment, noting large size of defendant and need for deterrence); *Ellison v.*

*O'Reilly Automotive Stores, Inc.*, 463 S.W.3d 426, 441-42 (Mo. App. W.D. 2015)

($2 million in punitive damages at 10:1 ratio); *Mignone v. Missouri Dep't of Corr.*,

546 S.W.3d 23, 44–45 (Mo. Ct. App. 2018) ($1 million in punitive damages at

10:1 ratio); *Diaz v. Autozoners, LLC*, 484 S.W.3d 64, 91–92 (Mo. App. W.D.

2015) ($1 million in punitive damages at 13:1 ratio); *Holland v. Schwan's Home*

*Serv., Inc.*, 2013 IL App (5th) 110560, ¶ 260, 992 N.E.2d 43, 95 ($3.6 million in

punitive damages at 5:5 ratio for workers' compensation retaliation); *and Weidler*

124 N.M. at 604 ($500,000 punitive damages at 8:1 ratio for retaliatory

termination).

      The preceding federal and state case law put Defendant on notice of the

punitive damages that could be issued for its unlawful retaliation, especially when

that retaliation was part of a pattern of suppressing complaints on campus and to

the DOL that risked the health and safety of others.  The size and ratio of the

award properly fits within the range of verdicts given the reprehensibility and

scope.  Defendant's conduct was particularly reprehensible as many employees

and students were harmed as a result, and their health and safety were at risk of

future harm if the conduct was not deterred.

### c) Policy of punitive damages

      In addition to the aforementioned case law, the underlying policy of

punitive damages supports substantial deterrence of unlawful retaliations

involving issues of health and safety.  *See, e.g.  Luciano v. Olsten Corp.,* 110 F.3d

210, 221 (2d Cir. 1997) ("The jury is to be guided by the same principles that have

traditionally guided such determinations: the amount necessary to punish the

defendant for its conduct and to deter the defendant and other employers from

engaging in such activity in the future.").  The following policy considerations

47

illustrate why punitive damages are especially necessary for deterrence in cases of employment retaliation.

First, there is enormous potential harm from employment retaliation, and it therefore requires strong deterrence. Health and safety complaints protect employees and all citizens who patron or are affected by the business. The safety of society relies on employees in all industries feeling free to report safety issues. Whether the business is in energy, scientific research, transportation, education, or any other industry, the risk from retaliation of safety complaints is high and the financial motive is strong. This is especially true given the financial incentives that exist for employers to cut costs, violate safety laws, externalize risk to the public, and suppress safety complaints. If punitive damages for unlawful retaliations were overly restricted in their amount and ratio, there would be inadequate deterrence for employers and the safety of society would be imperiled.

Second, retaliatory terminations are difficult claims to catch and prove, unlike many intentional torts where the conduct is apparent to the victim and observers. An employee must first realize the termination was retaliatory and then prove the reasons proffered by the employer were a lie, which is often very difficult. A comparable type of case is financial fraud, which regularly has large punitive awards and ratios. While both retaliation and financial fraud involve deceit that is difficult to catch and prove, employees are even less poised to prove

48

retaliation than businesses are to prove fraud. Businesses have more institutional

knowledge, individuals, and resources to discover they have been wronged,

investigate claims, file those claims, and withstand years of litigation. Employees,

on the other hand, are less likely to realize they were wronged, to know there are

laws against such conduct, and to have the resources to withstand protracted

litigation through trial.

For these reasons, when punitive damages are finally issued in retaliation

cases involving health and safety, those awards should be given substantial

deference due to the harm involved and the difficulty in catching and proving the

conduct. The more difficult deterrence is to obtain, the greater it must be. The

greater the potential harm from the conduct, the greater the deterrence required.

**d) Financial evidence**

Defendant's decision not to present any evidence of its finances also

undermines its challenge of the verdict. *See, e.g. Mathie v. Fries*, 121 F.3d 808,

815 (2d Cir. 1997) (quoting *Smith,* 861 F.2d at 373) ("Under well established

precedent in this Circuit, 'it is the defendant's burden to show that his financial

circumstances warrant a limitation of the award.'"); *Provost v. City of Newburgh*,

262 F.3d 146, 163–64 (2d Cir. 2001); *and Shahi*, 2008 VT 25 at ¶ 27.

Defendant's decision not to present any evidence of its finances could have

been made for any number of reasons, including a determination that its finances

49

might cause the jury to award greater punitive damages. Whatever the reason, this decision undermines Defendant's subsequent claim that the punitive damages shock the conscience and violate its due process. No evidence existed as to what, if any, financial impact the award might have on Defendant. *See, e.g., Fishman v. Clancy*, 763 F.2d 485, 490 (1st Cir. 1985) ("Defendants chose not to offer proof of their financial conditions despite their awareness of plaintiff's request for punitive damages. Thus, we reject both the argument that these awards are so excessive on their face that they cannot stand, and the argument that the amounts are shocking specifically with regard to these defendants."); *Provost*, 262 F.3d at 163–64 (citing *Fishman*, 763 F.2d at 490); *and Luciano*, 110 F.3d at 221.

For these reasons, a defendant's choice not to present evidence of its finances at trial weighs against a subsequent claim that the punitive damages shock the conscience or violate its due process.

## 2. The District Court's reasons for overturning the jury's award of punitive damages were erroneous.

The District Court noted the following reasons it believed the punitive damages violated Defendant's due process. (A-52-53). These reasons were erroneous and in no way justified a new trial.

50

### i.     *Defendant's conduct was not limited in scope, and the duration of the conduct did not negate high reprehensibility.*

First, the conduct was not limited in scope.  Defendant's pattern of suppressing safety complaints involved its Vice President and corporate officials, and it affected all students and employees at NJCC.  The jury could have also found Defendant's scheme risked students and employees at all nine Job Corps campuses it oversaw.

Second, the duration of the conduct in no way negated the high reprehensibility.  Punitive damages are intended to punish and deter.  For deterrence, the most important question is the likelihood of future harm.  *See TXO Production Corp.,* 509 U.S. at 460.  At the time of trial, Defendant had been in business for over twenty-seven years and oversaw nine campuses across the country.  The jury received evidence showing Defendant's conduct was likely to continue and risk future harm to others.  This included financial motive to suppress safety complaints, a pattern of suppression of safety complaints, numerous examples of unaddressed safety issues, and actual harm to students and employees.  As a result, the jury reasonably found the conduct was likely to continue without substantial deterrence.

### ii.     *Plaintiff's probationary period was irrelevant.*

An employee is protected against unlawful retaliation immediately upon hire.  There are no exceptions under VESTA's retaliation provision if an employee

51

is in the probationary period of employment. This is sensible because it is imperative employees feel free to make safety complaints no matter how long they have been working for that particular employer.

### iii. *The jury properly disregarded Defendant's claim that it was trying to reestablish higher standards at NJCC.*

The District Court noted that Defendant claimed it was trying to reestablish higher standards at NJCC. (A-28). In support, Defendant proffered testimony from its Vice President that things were a "mess" because of the prior contractor. (A-509). However, the jury properly disregarded this testimony as it was widely contradicted by all other witnesses in the case.

Evidence at trial showed Defendant was not attempting to establish higher standards but was instead cutting costs and intentionally suppressing safety complaints. The evidence showed a myriad of safety violations and suppression by Defendant, including cutting the Safety Officer position, drastically cutting food costs, failing to provide cleaning supplies, failing to address mold and poor food quality making students sick, violating DOL rules regarding weapons, imposing an unlawful sick leave policy on employees, and a pattern of intentional suppression of safety complaints on campus and to the DOL. *See, e.g.,* §§ (I)(C)(1)(i)(a), (d) and (e) *supra*. For these reasons, the jury properly disregarded Defendant's claim that it was trying to reestablish higher standards, and the District Court erred in overturning the jury's verdict on that basis.

### iv.    Defendant's claim of good faith mistake was properly disregarded by the jury.

The evidence at trial disproved Defendant's claim of good faith mistake and established liability for its unlawful retaliation against Plaintiff, as previously set forth in § (I)(C)(1)(i)(e) *supra*.  The District Court acknowledged this fact.  (A-41) ("A reasonable juror could 'infer[] from the nature of [D]efendant's conduct and the surrounding circumstances' that Defendant 'fabricated grounds for [Plaintiff's] termination' in retaliation for Plaintiff's VESTA complaints.") (quoting *Ainsworth*, 592 A.2d at 875).  The jury determined Defendant intentionally retaliated against Plaintiff, and such a verdict contradicts Defendant's claim of good faith mistake.  Accordingly, it was improper for the District Court to cite Defendant's claim of good faith mistake as a basis for overturning the jury's award of punitive damages.

### v.    Retaliation against other employees for making safety complaints.

The District Court reasoned "notwithstanding claims about a culture of suppressing complaints, there was no evidence that other employees had been disciplined or terminated on that basis."  (A-53).  This finding was erroneous.  Evidence indeed showed other employees had been retaliated against for making safety complaints.  (A-273-76, 280-81, 297, 324, 329).

Furthermore, even if this were not the case, the absence of other retaliations would in no way justify overturning the punitive award.  Defendant had just begun oversight of NJCC two months prior, yet it had already implemented its scheme to

suppress safety complaints on campus and to the DOL, and it had retaliated against Plaintiff as part of that scheme. The fact the scheme began immediately upon Defendant taking over NJCC was another reason the jury was reasonable to disregard Defendant's argument. The evidence demonstrated Defendant's conduct was likely to continue and risked serious harm to others if not deterred.

For each of these reasons, the District Court erred in granting a new trial based on this basis.

### vi. *The civil penalties under VOSHA and VESTA do not contradict the jury's punitive damages award.*

Lastly, the District Court held individual statutory fines under VOSHA and VESTA contradicted the punitive damage award. (A-55). This was erroneous for the following reasons.

First, the VOSHA and VESTA statutory fines cited by the District Court were in no way comparable to the conduct in this case because they did not apply to retaliation, only to individual safety violations. *See State Farm*, 538 U.S. at 418. VOSHA allows for fines of $127,749 per willful violation. 21 V.S.A. 210(a). VESTA allows for fines of $5,000 per violation. 21 V.S.A. § 483(m); 21 V.S.A. § 345; *and* Vt. Admin. Code 13-5-13(a).

Not only did the statutory provisions cited by the District Court not relate to retaliation, there were specific retaliation penalties elsewhere in the statutes which provided for punitive damages and placed no caps thereon. 21 V.S.A. §§ 483(l);

21 V.S.A. §§ 397(b); 21 V.S.A. § 232; *and Kwon v. Edson*, 2019 VT 59, ¶ 34, 210 Vt. 557, 570, 217 A.3d 935, 945 (2019) (damages include punitive damages); *see also Clymer v. Webster*, 156 Vt. 614, 631, 596 A.2d 905, 915 (1991).

By placing specific limits for individual safety violations, but no limit on punitive damages for unlawful retaliation, the Vermont legislature expressed the clear intent that punitive damages are not limited in any such manner. This makes sense, as retaliatory terminations are extremely harmful to employees, have an enormous impact on the safety of others, and risk immeasurable safety violations in the future.

The Second Circuit has also disregarded the comparison of civil penalties when, as here, they do not involve comparable conduct. *See Uzan,* 509 F.3d at 85–86; *see also Broome v. Biondi*, 17 F. Supp. 2d 211, 229 (S.D.N.Y. 1997). There are no comparable statutory fines to retaliatory terminations because they are unique unto themselves. They require proof that the employer intentionally retaliated against an employee for complaining about safety issues. This is one of the most dangerous things an employer can do because it creates a culture of fear and suppression of safety complaints in the future. Furthermore, where the retaliation is part of a larger pattern of safety violations and suppression, the danger is multiplied. For these reasons, deterrence would never be adequate

against retaliatory terminations if punitive damages were limited by individual statutory fines.

Finally, even if the individual statutory fines were somehow relevant, the District Court only compared the punitive damages to a single safety violation. Defendant engaged in a policy of continuous safety violations, including student illnesses from substandard food and mold, deplorable dorm conditions, lack of cleaning supplies, the unlawful sick leave policy, and the intentional suppression of safety complaints on campus and to the DOL. Thus, even if proper as a metric, the individual statutory fines supported the jury's award of punitive damages.

For these reasons, the District Court erred in finding statutory fines justified overturning the punitive damages award.

## II. IN THE ALTERNATIVE, THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO GRANT REMITTITUR

### A. STANDARD OF REVIEW

"[I]n deciding remittitur motions in diversity cases, federal courts apply federal procedural standards and state substantive law." *Imbrogno v. Chamberlin*, 89 F.3d 87, 90 (2d Cir. 1996). Under Vermont law "[r]emittitur is appropriate only if the jury's verdict is outside 'the universe of possible awards which are supported by the evidence.'" *Mathieu Enterprises, Inc. v. Patsy's Companies*, 2009 VT 69, ¶ 10, 186 Vt. 557, 559, 978 A.2d 481, 484 (2009) (quoting *Bonura v. Sea Land Serv., Inc.,* 505 F.2d 665, 670 (5th Cir.1974)).

56

"In cases where remittitur is necessary, a court 'should reduce the verdict only to the maximum that would be upheld by the trial court as not excessive.'" *Rousseau v. Coates*, No. 2:18-CV-205, 2022 WL 3910990, at *5 (D. Vt. Aug. 30, 2022) (quoting *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990)).

## B. THE VERDICT DID NOT INDICATE PREJUDICE BY THE JURY

The District Court held remittitur was unavailable because the damages were so excessive they indicated prejudice by the jury. (A-56-57).

For all reasons set forth in § I *supra*, the jury's awards of lost wages and punitive damages were fully supported by the evidence and in no way indicated passion or prejudice. Hence, even if those awards were excessive, they were not so excessive as to preclude remittitur. *Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38, 40-41 (2d Cir. 1997).

Furthermore, "[t]he cases in which the jury's award is seen to reflect prejudice . . . are generally limited to those in which the remittitur granted is totally out of proportion to the damages allowed by the district court." *Id.* at 41. In *Ramirez*, the Second Circuit cited the following examples of remittiturs that were so substantial they indicated prejudice on the part of the jury. *See Auster Oil & Gas, Inc. v. Stream,* 835 F.2d 597, 603 (5th Cir.1988) ($4.35 million remittitur of $5 million award); *and Wells v. Dallas Indep. School Dist.*, 793 F.2d 679, 683–84 (5th Cir.1986) ($1.65 million remittitur of $1.9 million award).

57

Here, even if the District Court had granted remittitur to "the maximum that would be upheld by the trial court as not excessive," *Earl*, 917 F.2d at 1328, such remittitur would have been nowhere near the large remittiturs cited by the Second Circuit as indicative of passion or prejudice on the part of the jury. *Ramirez*, 112 F.3d at 41.

For each of these reasons, the District Court abused its discretion in holding remittitur was unavailable.

## C. POLICY FAVORS REMITTITUR OVER RETRIAL

Policy also favors remittitur over retrial. Punitive damages are intended to protect society by deterring dangerous conduct. However, if plaintiffs were required to retry cases, without the opportunity of remittitur, it would create the unfortunate incentive for plaintiffs to limit their requests of punitive damages to avoid the risk of retrials. This would completely undermine the purpose of punitive damages and the ability of the judicial system to deter dangerous conduct.

Retrials are also costly to the litigants and court system, and they have inherent flaws. The defendant has a second chance to prepare its evidence and arguments knowing how the first trial proceeded, and key witnesses may become unavailable years later, as occurred in this case where the HR Manager was unavailable for the retrial.

58

Furthermore, retrials on punitive damages are particularly flawed because punitive damages relate so closely with the evidence of the liability of the defendant. Therefore, the jury which determined liability is the jury most capable of determining punitive damages.

Lastly, remittitur avoids large disparities in verdicts. Such disparities risk undermining the public's confidence in the legal system.

For each of these reasons, the District Court abused its discretion by granting Defendant a new trial without providing the option of remittitur.

## III.   IN THE ALTERNATIVE, THE DISTRICT COURT ABUSED ITS DISCRETION BY EXCLUDING EVIDENCE AT RETRIAL

### A. STANDARD OF REVIEW

A court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. "In weighing the probative value of evidence against the dangers and considerations enumerated in Rule 403, the general rule is that the balance should be struck in favor of admission." *S.E.C. v. McGinnis*, No. 5:14-CV-6, 2015 WL 5643186, at *14 (D. Vt. Sept. 23, 2015) (quoting *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir.1980)).

"Evidentiary rulings ordinarily will not be overturned absent an abuse of discretion." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997). "[A]n evidentiary error in a civil case is harmless unless [the appellant demonstrates that]

59

it is likely that in some material respect the factfinder's judgment was swayed by the error." *Zakre v. Norddeutsche Landesbank Girozentrale*, 344 F. App'x 628, 630 (2d Cir. 2009) (quoting *Tesser v. Bd. of Educ.,* 370 F.3d 314, 319 (2d Cir.2004)).

## B. THE EXCLUDED EVIDENCE WAS ADMISSIBLE

At retrial, the District Court granted Defendant's Motion in Limine to exclude evidence of suppression of complaints of substandard food quality regularly making students sick ("food safety complaints") and suppression of a complaint regarding a student with a prohibited knife ("weapon complaint"). (A-666-68, 677). For the following reasons, the District Court erred in granting Defendant's Motion in Limine.

In excluding the evidence, the District Court went against its prior ruling that the food safety and weapon complaints were relevant and admissible. (A-28, 45-45). The District Court previously held the evidence "was probative of the context in which Plaintiff's alleged protected activity took place and admissible on the issue of retaliatory intent." (A-44). It also held it was relevant to punitive damages. (A-45). This evidence was relevant to punitive damages for the reasons set forth in § (I)(C)(1)(i)(b) *supra*, including as to reprehensibility, pattern, deceit, risk to the health and safety of others, and the likelihood of future harm. It was critical to the jury's analysis of punitive damages because it revealed the harm that

60

Defendant's scheme of suppression had on the health and safety of others. The disparity between the first and second trial verdicts indicates the exclusion of the evidence impacted the verdict.

Defendant's hearsay objection to the food safety complaints was also unfounded. As Center Director, it was Ms. Grangent's duty to oversee everything on campus, including safety, and to report issues to corporate. (A-240-42). She testified "it became a constant issue" that "students would go there [to the cafeteria to eat], get sick, and [then go to] the wellness center or anywhere on campus, and then be sent to their dormitories to recover." (A-280).

This testimony made clear the sickness of students from poor food quality was an ongoing issue that Ms. Grangent knew about from numerous sources, including the cafeteria and wellness staff. The complaints made by staff to Ms. Grangent were non-hearsay because they were statements on matters within the scope of their employment duties. F.R.E. 801(d)(2)(D).

Furthermore, even if the complaints had come from students, not staff, the students' statements about being sick from food would qualify under the Rule 803(3) exception for statements of a "then-existing . . . physical condition (such as mental feeling, pain, or bodily health)." F.R.E. 803(3). They also would qualify under Rule 803(4) as statements made for medical treatment because they were

made to the wellness department, which then reported the illnesses to Ms. Grangent. F.R.E. 803(4).

For each of these reasons, the District Court abused its discretion by granting Defendant's Motion in Limine to exclude evidence at retrial of its suppression of food safety and weapon complaints.

## IV.    CONCLUSION

For the aforementioned reasons, Plaintiff respectfully requests that this Court REVERSE the District Court's decision granting Defendant a new trial on damages and AFFIRM the judgment at trial. In the alternative, Plaintiff respectfully requests this Court GRANT remittitur. In the alternative, Plaintiff respectfully requests this Court GRANT a new trial on damages.

## CERTIFICATE OF COMPLIANCE

This brief contains 13,732 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), and complies with the volume limitation of Federal Rule of Appellate Procedure 32(e) and Local Rule 32.1. This brief was prepared in a proportionally spaced typeface, Times New Roman with size 14 font, and complies with the typeface and style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6).

Respectfully submitted this 26th day of April, 2023.

By: /s/ William Pettersen, Esq.
William Pettersen, Esq.
Pettersen Law PLLC
1084 E. Lakeshore Dr.
Colchester, VT 05446
(802) 477-2780
*Attorney for Plaintiff-Appellant*