# 23-87

# United States Court of Appeals

## for the

## Second Circuit

———◆◗◆———

THOMAS COLE,

*Plaintiff-Appellant,*

– v. –

FOXMAR, INC. D/B/A EDUCATION AND TRAINING RESOURCES,

*Defendant-Appellee.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

## **BRIEF OF DEFENDANT-APPELLEE**

Michael D. Billok, Esq.
Paul J. Buehler, Esq.
BOND, SCHOENECK & KING, PLLC
*Attorneys for Defendant-Appellee*
268 Broadway
Saratoga Springs, NY 12866
Telephone: (518) 533-3000

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ................................... iv

ISSUES PRESENTED FOR REVIEW ................................................... 1

STATEMENT OF THE CASE .......................................................... 2

RELEVANT FACTS ................................................................. 6

     A.   Background Facts ....................................................... 6

     B.   The Events of July 23, 2018 .......................................... 8

     C.   Cole Walks Off the Job on July 24, 2018 ............................. 9

     D.   Foxmar Terminates Cole on July 27, 2018 ............................ 10

     E.   Evidence Regarding Compensatory Damages ............................ 12

     F.   Evidence Regarding Punitive Damages ............................... 13

     G.   Initial Trial Verdict, Order on Verdict, and Damages Retrial ........... 15

SUMMARY OF ARGUMENT ........................................................ 16

STANDARD OF REVIEW .......................................................... 16

ARGUMENT .................................................................... 18

I.   The District Court Did Not Abuse Its Discretion in Overturning the
Damages Award. ............................................................ 18

     A.   The District Court Did Not Abuse Its Discretion In Overturning
The Compensatory Damages Award. ................................. 18

     B.   The District Court Did Not Abuse Its Discretion In Overturning
The Punitive Damages Award. ...................................... 22

II.  The District Court Did Not Abuse Its Discretion in Ordering a New
Trial Instead of Remittitur. .................................................. 30

III.  The District Court Did Not Abuse Its Discretion in Excluding
Irrelevant and Prejudicial Evidence. .......................................... 33

CONCLUSION .................................................................. 36

Certificate of Compliance With Type-Volume Limit, Typeface Requirements,
And Type-Style Requirements ................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bain v. Wrend,*
   No. 15-CV-202, 2019 WL 7972050 (D. Vt. 2019) ............................................29

*Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.,*
   492 U.S. 257 (1989)............................................................................................17

*Delosa v. Burlington Elec. Dept.,*
   2003 WL 25930959 (Vt. State Ct. 2003)...........................................................29

*E.E.O.C. v. Mike Smith Pontiac GMC, Inc.,*
   896 F.2d 524 (11th Cir. 1990) ...........................................................................18

*Fernot v. Crafts Inn, Inc.,*
   1994 WL 766829 (Vt. State Ct. 1994)................................................................29

*Gasperini v. Center for Humanities, Inc.,*
   518 U.S. 415 (1996).....................................................................17, 22, 30, 31

*Havill v. Woodstock Soapstone Co.,*
   177 Vt. 297 (2004) .......................................................................................19, 22

*Havill v. Woodstock Soapstone Co.,*
   181 Vt. 577 (2007)..............................................................................................22

*Haynes v. Golub Corp.,*
   166 Vt. 228 (1997)..............................................................................................21

*Haynes v. Golub Corp.,*
   692 A.2d 377 (Vt. 1997).....................................................................................21

*Manley v. AmBase Corp.,*
   337 F.3d 237 (2d Cir. 2003) ..............................................................................17

*Motorola Credit Corp. v. Uzan,*
   388 F.3d 39 (2d Cir. 2004) ................................................................................29

*Ramirez v. New York City Off-Track Betting Corp.,*
   112 F.3d 38 (2d Cir. 1997) ................................................................................31

ii

*Shahi v. Madden*,
   183 Vt. 320 (2008) ............................................................................................24

*Starter Corp. v. Converse, Inc*.,
   170 F.3d 286 (2d Cir. 1999) ...........................................................................34

*Sweet v. Roy*,
   801 A.2d 694......................................................................................................3

*Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd*.,
   930 F.2d 1021 (2d Cir. 1991) ..........................................................................31

iii

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Foxmar, Inc. does not have any parent corporation or any publicly held corporation that owns 10% or more of its stock.

15981228.3 7/26/2023

## ISSUES PRESENTED FOR REVIEW

1. In July 2018, Appellant Thomas Cole walked off the job just before the start of his shift as a dormitory resident counselor, responsible for at-risk youth. The Center Director contemporaneously noted that this was "not the first time Tom has abandoned his job post" and that he "created a hardship by leaving the center without coverage." Foxmar accordingly terminated Cole, but nonetheless, in July 2021 a jury found Foxmar liable under safety and sick time anti-retaliation provisions of Vermont law. That jury also awarded Cole more wage damages than he requested, which under Vermont law is "too speculative" an award. The jury also awarded Cole $3,000,000 in punitive damages, the largest punitive damages award in an employment case in state history. The district court set aside the damages awards and ordered a new trial for damages. Was that an abuse of discretion?

2. Did the district court abuse its discretion in ordering a new trial for damages instead of remittitur? If the district court did so, what would the remedy be after the new trial for damages has already taken place?

3. In the new trial for damages, did the district court abuse its discretion in excluding hearsay regarding that students were feeling ill due to what they ate, and that a student at the worksite once was found in possession of a knife with a three-inch blade?

## STATEMENT OF THE CASE

As in any case that makes its way to trial, the parties dispute the issue at its core: whether Foxmar terminated Thomas Cole for walking off the job on July 24, 2018, or whether it terminated him because he had made complaints protected under the Vermont Occupational Safety and Health Act (VOSHA) and the Vermont Earned Sick Time Act (VESTA). Foxmar still disputes this issue. However, in 2021, a jury found that Foxmar retaliated against Cole in violation of VOSHA and VESTA. That finding has not been appealed, and is not at issue here.

What is at issue is the remainder of the 2021 jury's verdict, finding that Cole was due $140,943 in lost wages, $75,000 of emotional distress damages, and $3,000,000 in punitive damages. After the trial, Foxmar filed a renewed motion for a directed verdict or new trial under Rules 50 and 59. And while the district court did not disturb the jury's liability verdict, it found the jury's damages verdict violated Vermont law.

Regarding the jury's wages award, the court quoted the Vermont Supreme Court's holdings that "[w]hen front pay is allowed, the damages must be limited to a reasonable period of time, and the amount must not be speculative," and that a wages award may be "too speculative because it exceeds the amount claimed by plaintiff." SA25 (quoting *Haynes v. Golub Corp.*, 692 A.2d 377, 383 (Vt. 1997)). Applying those holdings to the facts of the case, the court first noted that the jury's

wage award of $140,943 exceeded Cole's request for wages worked until the age of 70, and that the overage "cannot be explained by an adverse tax offset or Plaintiff's *post hoc* justifications," which the court found all to be speculative. SA25-26. The court then considered the fact that even if the jury had been seeking to award pay to Cole to the age of seventy,[1] "no rational view of the evidence supports a conclusion that Plaintiff would have worked [for Foxmar] until he was seventy." SA27. The court noted that Plaintiff's work history—changing jobs every three years prior to Foxmar, and every three months after working at Foxmar, and which also included Plaintiff failing to mitigate his damages by quitting two managerial positions—did not "support[] a conclusion that he would have remained in the same position throughout his career." *Id.*

The district court then turned to the jury's $3 million punitive damages award, applying both Vermont law and the Due Process Clause of the Fourteenth Amendment.[2] SA27-28. Reviewing the evidence presented at trial, the court found that "Defendant's conduct does not support the amount of punitive damages awarded, which reflects a high degree of reprehensibility and virtually no mitigating circumstances," and noted that the verdict was "one of the largest … in Vermont

---

[1] In closing argument, Plaintiff requested pay to the age of seventy (Joint Appendix "JA" 619), and Plaintiff's expert's damages chart maxed out at $136,716 for Plaintiff working to the age of seventy (JA848).

[2] The district court cited *Sweet v. Roy*, 801 A.2d 694 for the proposition that it "maintain[ed] the Vermont standard is more deferential to the jury." SA28.

3

history." SA29. The court then considered the high ratio of the punitive award to the compensatory damages award (which was already "unsupported by the evidence and in excess of the amount Plaintiff requested," thus inflating the denominator and masking an even higher ratio). SA30-31. It found that the Vermont Supreme Court has only upheld ratios of 10:1 or higher where "the compensatory damages have been relatively small," such as $300 or $10,000, and where the conduct was "particularly egregious," and that neither was present in the instant case. SA30-31. Finally, the court considered the fact that penalties for VESTA and VOSHA violations are $5,000 and $126,749, respectively, and that the jury's "punitive damage award dwarfs these civil penalties which reflect the Vermont Legislature's determination of an appropriate punishment." SA31-32. As a result, the court found the punitive damages award to be "grossly excessive," "a miscarriage of justice," and "beyond the outermost limit of the due process guarantee." SA32.

The court then considered, under Rule 59, whether it should grant remittitur or a new trial for damages. It noted that in some cases, "the size of a jury's verdict may be so excessive as to be inherently indicative of passion or prejudice and to require a new trial." SA32-33 (citations omitted). It also noted examples of where the appellate court had found that remittitur was improper when it was a high proportion of the damages, such as reducing a $5 million award by $4.35 million, or reducing a $1.9 million award by $1.65 million. SA33. Thus, the court found that

4

"[b]ecause of the grossly excessive award of punitive damages, coupled with awards of back pay and front pay unsupported by the evidence," any remittitur would be an outsized proportion to the damages of the case, and so a new trial was the proper remedy. *Id.*

The road to the new trial was long and hard fought. Plaintiff first moved for reconsideration of the district court's decision, but the district court brought a swift end to that effort, holding: "Under Vermont law, an award of punitive damages is 'manifestly and grossly excessive,' when it is 'so great ... as to indicate that it is the result of perverted judgment, accident, or gross mistake.' That standard is satisfied in this case."[3]

Plaintiff then entered into a settlement agreement—but then backed out of said settlement agreement, resulting in a motion to enforce the agreement, which the court denied. JA16 (Docket Nos. 170-76). Defendant also made a Rule 68 offer of judgment in the amount of $375,000 that Plaintiff did not accept. (JA 19, Docket No. 215). That gamble did not pay off, however, when the jury only awarded Plaintiff $35,000 in back pay and $20,000 in emotional distress damages at the damages retrial. SA35.

---

[3] Dkt. No. 154, at 4 (quoting *Coty v. Ramsey Assocs., Inc.*, 546 A.2d 196,206 (Vt. 1988) (quoting *Woodhouse v. Woodhouse*, 130 A. 758, 789 (Vt. 1925))).

5

We thus return to the issue in dispute: Did the district court abuse its discretion in ordering a new trial for damages? In order to examine this issue, it is necessary for this Court to review the facts that were before the district court. But because the "Facts of the Case" in Appellant's brief is replete with misstatements[4] and omissions,[5] it is necessary for Foxmar to provide the relevant facts—as set forth at trial—to the Court.

## RELEVANT FACTS

A. Background Facts

Foxmar works with disadvantaged youth to provide education and job training opportunities. JA504. There are about 125 Job Corps centers throughout the country, and the U.S. Department of Labor ("DOL") contracts with companies, including Foxmar, to run many of the Job Corps Centers. JA 505-06. The Centers can be described as a mix of a "high school and a vocational school," with training to help the youth get into a community college, in a residential setting with students aged 16 to 24 living in dormitories. JA506, 516.

---

[4] For example, Appellant claims the district court "found" that Foxmar had a corporate culture of suppressing legitimate complaints (Br. 12), when the district court did not make such a finding; it simply noted that Appellant had presented evidence in support of that contention. JA28. *See also* note 12 and p. 26, *infra.*

[5] Despite the fact that the crux of the case relies on whether Appellant abandoned his job on July 24, 2018, when he abruptly left right before the start of his shift, leaving minors in his assigned dorm unattended, Appellant devotes less than 10 words to this issue, casually stating that Appellant "left work early but notified the Center Director." Br. 7.

6

Foxmar took over operations at the Northlands Job Corps Center on June 1, 2018. JA514. When Foxmar took over the Center, the conditions were "a mess." JA 509. There was no employee scheduling system. JA509-10. The previous contractor, CHP, had done such a poor job with Northlands that the DOL ended CHP's contract early, and installed a temporary contractor for 14 months, Chugach, from which Foxmar took over. JA509. At that time, the Northlands center was ranked near the bottom of the 125 Job Corps Centers, somewhere between 90 and 100. JA507-08. By the time of trial three years later in July 2021, Foxmar had improved Northlands' ranking to between 40 and 50.[6] JA508.

Alicia Grangent was the Center Director in July of 2018; she had been serving in that position in acting or actual capacity since mid-2017. JA238-39. Appellant Cole was originally hired into the position of Residential Counselor by Chugach in April 2018, and was retained by Foxmar when it took over on June 1, 2018. JA67-68, 179. Before the time that Foxmar took over, there were already issues with Cole calling the students "ghetto" (JA548), and abandoning his job post (JA826).

---

[6] Foxmar has a history of improving poorly performing multiple Job Corps Centers. JA507. And indeed, by the time of the damages trial in December 2022, the ranking of the Northlands Center had improved to *number 6 in the country.* December 2022 Trial Transcript p. 741 (Doc. No. 224).

7

B. <u>The Events of July 23, 2018</u>

Cole worked the 3:00 PM to midnight shift. JA76. His regular assignment was Dorm 21. JA81. On the afternoon of July 23, 2018, the Residential Counselor assigned to Dorm 24, Paige Howell, was out sick, and Cole was assigned to cover her dorm, Dorm 24, as well as Dorm 21. JA82. Cole testified that he felt he was "spread very thin" covering both dorms. JA211-12. It was the duty of the dorm's Residential Counselor to ensure the dorm had sufficient cleaning supplies. JA91. Cole testified that he kept his dorm, Dorm 21, fully stocked. JA187. However, on the evening of July 23, he found that Dorm 24 did not have any cleaning supplies. JA92. Cole could have, but did not, get cleaning supplies from Dorm 21. JA193. Instead, once the students informed his supervisor, Angela Mobley, that Dorm 24 was out of cleaning supplies, *Mobley* immediately went and got cleaning supplies for the students in Dorm 24. JA189.

In addition, during the pre-shift meeting of employees with Mobley on July 23, 2018, Cole contends that employee Tori Ramon said that she was not feeling well, and asked for everyone to be understanding, and Mobley responded by saying, "you folks in Vermont need to take your medicine." JA82-83. Ramon did not ask Mobley if she could go home. JA183. Cole later overhead Mobley tell Ramon as they were walking in the hallway, "we will find somebody so that you can go home." JA86. However, he did not hear anything said before or after that statement, and did

not hear any response from Ramon. JA185. When Cole checked out with Ramon for the night, he did not ask her why she was still at work, or if she felt better. JA194.

C. Cole Walks Off the Job on July 24, 2018

On the morning of July 24, Cole reached out to Grangent's assistant, Brian Lacharite, and asked to make an appointment with Grangent. JA195. Lacharite scheduled a meeting for that morning. *Id.* At the meeting with Grangent, Cole complained to her about the fact that Dorm 24 had not had cleaning supplies the night before. *Id.* Cole testified that he could not recall whether he made any complaint about employees having to find their own replacements before going home. JA196. Instead, he recalled that he complained about having to work in the proximity of sick employees (like Tori Ramon), and Grangent responded, "Tom, we're not asking you to do that. Nobody is asking you to do that." *Id.*

Shortly before the start of Cole's 3:00 shift, at the in-briefing, he observed Howell and Ramon enter the room, looking like they were not feeling well. JA198. In response, Cole left immediately, without waiting for his supervisor, Mobley, or even talking with Howell or Ramon. *Id.* He got in his car and drove to Grangent's office, wanting to talk with her because he was "not satisfied" with the outcome of their conversation from that morning. JA114. On the way to her office, he encountered Grangent, almost running her over with his car. JA433. Cole told Grangent about Howell coming to work and curling up in a ball on the couch. JA247.

9

He told Grangent, "I'm not up for this tonight," or "I can't do this tonight." JA198-99. Grangent asked him to "hold on" and to talk and work it out, but he just responded that he needed to go. JA247. Cole testified that Grangent then had an incoming call, and instead of waiting for her, he drove away. JA199-200. He then drove to Grangent's office and told Lacharite that he was leaving, and that she "could follow up with me if she would like to." JA200. Ramon then called Cole, asking "where are you?" JA201. Cole responded, "Talk to Alicia. Alicia can explain," and then ended the call. *Id.*

Grangent then saw Howell, let her know that Cole had reported that she was sick, and sent Howell home. JA434-35. Grangent also talked with Mobley, who was upset with Cole leaving the dorm short-staffed, and said that Cole should be terminated for doing so. JA250. Grangent also tried calling Cole twice, later on July 24, and again on July 25, leaving a message; Cole did not call back. JA435. Human Resources Director Bernadette Brookes also tried calling Cole several times, but Cole did not call back. JA376, 446.

D. Foxmar Terminates Cole on July 27, 2018

On the morning of July 27, at 10:08 AM, Mobley emailed Brookes, stating: "On Monday, July 23, 2018,[7] I learned that Tom reported to work but left the center

---

[7] There is no dispute that this date is incorrect; Cole left on Tuesday, July 24, not Monday July 23.

10

before brief-in at 3:00 p.m. … He abandon[ed] his job and I had to quickly fill his shift to provide safety and security for students during the prime shift." JA824.

At 10:41 AM, Grangent responded, including Executive Vice President Howard Harmon and Vice President Scott Dunham: "this is not the first time that Tom has abandoned his job post. Once under Chugach and now under ETR. I realize that the first one doesn't count. However, he has created a hardship by leaving the center without coverage. We terminate students under the UE for the exact same thing (job abandonment)." JA826. Grangent continued: "Not only did he [not] give staff the opportunity to address the issue he doesn't even work the same dormitory as the ill employee that was sent home. Creating another vacancy." JA826.

At 11:21 AM, Harmon responded: "At this point, I would prefer to release, but I will let Alicia and Bernadette make the final call." JA828.

At 12:12 PM, Brookes responded: "My recommendation and that of the Center Director is to sever ties effective today Friday June 27, 2018." *Id.*

Brookes met with Cole at about 2:00 PM that afternoon, at which time she let him know that he was terminated. JA 133-35. Once she did, Cole asked Brookes if she had received a letter from him, but she had not received any such letter. JA135. (Earlier in the day, Cole had sent an email to Mari Trybendis and Alicia Grangent requesting a reassignment. JA770, 772.)

E. Evidence Regarding Compensatory Damages

Cole was hired at Foxmar at an annual salary of $50,000. JA709. After six months, he was to receive an incentive payment of $1,600 and his salary would increase to $53,330. *Id.*

At trial, Cole's damages expert Richard Heaps opined that if Cole had worked at Foxmar through age 70, then he would be due $100,227 in back and front wages, for a total of $136,716 when accounting for interest and taxes. JA344, 845. However, Heaps provided no opinion as to how long he expected Cole would have continued working at Foxmar. JA353-56. In addition, Heaps provided no consideration of the fact that Cole had been seeking to transfer out of his Residential Counselor position when he was terminated from Foxmar, or that Cole quit two full-time jobs after leaving Foxmar. JA367-70.

Heaps also did not actually review the relevant contract between the USDOL and Foxmar (JA358-59), and thus while he opined that Cole would have received 2.5% annual raises, that opinion was incorrect because such raises were not in the contract (JA862-923). Nor did Heaps consider the fact that since the government contract with Foxmar was limited in time (an initial two-year term, renewable up to a total of five years), another company other than Foxmar could be the employer at Northlands upon contract expiration. JA360-61, 862-923.

15981228.3 7/26/2023

The evidence at trial established that before Cole started working at Foxmar in June 2018, he had approximately one job every three years. JA170-73. After leaving Foxmar up until the time of trial in July 2021, he had approximately one job every three <u>months</u>. JA173-79.

Finally, at the time of trial in July 2021, Cole had just started working full-time at the Burlington Hilton since July 9, at the rate of $25 per hour, with benefits. JA162. However, evidence introduced at the December 2022 damages retrial showed that shortly after the July 2021 trial, just seven weeks after starting the Hilton job, Cole quit to move to Michigan to be with his wife, giving notice on August 27, 2021 that he was quitting as of the following day. JA1052.

F. <u>Evidence Regarding Punitive Damages</u>

Cole proffered the following evidence in support of his claim for punitive damages:[8]

- Cole's termination letter contained errors, stating that he left his shift early on July 23, as opposed to the correct date of July 24. In addition, his letter

---

[8] Cole also offered additional evidence from Grangent in support of his claim for punitive damages, but such evidence was flatly contradicted. For example, Grangent testified at trial that she did not want to fire Cole but was forced to do so (JA258, 305-06), which directly contradicts her contemporaneous email in which she makes clear she <u>wanted</u> to terminate Cole for job abandonment (JA826). Likewise, Grangent testified at trial that she had told Harmon about Cole's complaints before Cole's termination (JA302-03), but at her deposition had testified she had <u>not</u> done so (JA303-05).

13

stated he was supposed to work on July 24 and 25 and did not do so. JA774. Foxmar's explanation for this error was that the letter was drafted based upon Mobley's original email containing the error (JA824), and that the company was still in the midst of scheduling confusion after just taking over Northlands (JA299, 427, 458-59, 509-12).

- Grangent testified that an individual from Foxmar's corporate office told her not to report a student who had a knife with a three-inch blade to the USDOL because he was "a pretty good student." JA273-75.

- Grangent testified, over Defendant's objection, that somebody in the cafeteria told her that the food quality was poor and that students were getting sick from it. JA276-81.

- Howell testified that in September 2018 (several months after Cole's termination) that she saw what she believed to be mold in the dorm, and she and another employee noted it in the dorm log, and that a supervisor told her and the other employee to make those reports verbally, as opposed to in the dorm log. JA328-29. Howell also testified that after Mobley was terminated, Brookes told the employees to "stop making petulant complaints and acting like children." JA324-25.

At the close of evidence, Defendant moved to preclude the jury from considering the issue of punitive damages. The district court agreed that Cole had

not presented evidence sufficient for punitive damages on his VOSHA claim (that he was terminated in retaliation for complaining about safety issues), but if the jury found that Cole had established his VESTA claim (that he was terminated in retaliation for complaining about employees having to find replacements before going home sick), that the jury could consider punitive damages. July 2021 Trial Transcript pp. 818, 903.

Cole's counsel did not provide a proposed punitive damages amount in his initial closing argument. When he went to do so on rebuttal, counsel for Foxmar objected on the basis that he waived his ability to do so, but the district court overruled the objection, and Cole's counsel asked the jury to award $3.5 million in punitive damages, a number to which Foxmar could not respond. JA640-42. And during oral argument on Defendant's motion to set aside the verdict, the district court stated that it believed that Cole's counsel engaged in "a deliberate strategy" to withhold the requested punitive damages amount for the rebuttal closing argument. JA647.

G. <u>Initial Trial Verdict, Order on Verdict, and Damages Retrial</u>

As stated above, the jury in the July 2018 trial awarded $140,943 in back wages, $75,000 in emotional distress damages, and $3 million in punitive damages. Upon Defendant's motion, the district court kept the liability verdict in place, but ordered a retrial on damages.

15

At the outset of the December 2022 damages retrial, Foxmar moved *in limine* to exclude testimony regarding the quality of the food and the instance of a student bringing a knife with a three-inch blade to the Northlands campus as irrelevant and prejudicial; the district court granted the motion, even going so far as to label them "inflammatory." JA675; *see also* JA666-77. And after presentation of the evidence, the jury awarded Cole $35,000 in back pay, $20,000 in emotional distress damages, and no punitive damages.

This appeal followed.

## SUMMARY OF ARGUMENT

Foxmar's argument is quite straightforward. The standard of review is abuse of discretion, and the record is clear that based on the evidence before it and Vermont state law, the district court did not abuse its discretion in setting aside the jury's compensatory and punitive damages awards, ordering a new trial for damages, and excluding irrelevant and prejudicial hearsay evidence from the damages trial.

## STANDARD OF REVIEW

This Court has described the standard of review of a district court's decision to grant a new trial as follows:

> Our review of a district court's decision to grant a Rule 59(a) motion is deferential; we will reverse only for abuse of discretion. *See Amorgianos v. National R.R. Passenger Corp*., 303 F.3d 256, 261 (2d Cir.2002). A district court abuses its discretion when "(1) its decision rests on an error of law (such as the application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—

16

though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc*., 252 F.3d 163, 169 (2d Cir. 2001) (footnotes omitted).

*Manley v. AmBase Corp*., 337 F.3d 237, 245 (2d Cir. 2003).

But the standard of review does not end there. Because the two claims at issue were claims under Vermont state law, the district's court role in considering the Rule 59 motion was "to determine whether the jury's verdict [was] within the confines set by [Vermont] state law," and it is that determination that this Court is asked to review under the abuse-of-discretion standard.[9] *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 435-39 (1996) (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 279 (1989)).

---

[9] Cole mostly agrees that the abuse-of-discretion standard applies here, with one exception: he states that "courts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards." Cole Br. 14-15. This is correct. However, the district court considered the punitive damages award "manifestly and grossly excessive *under both Vermont law* and the Due Process Clause." JA56 (emphasis added). As the district court analyzed the size of the punitive damages award under Vermont State law, such analysis is subject to the abuse-of-discretion standard, not the *de novo* standard. *Gasperini*, 518 U.S. at 435-39; *Browning-Ferris*, 492 U.S. at 279.

17

**ARGUMENT**

I.   **The District Court Did Not Abuse Its Discretion in Overturning the Damages Award.**

A. The District Court Did Not Abuse Its Discretion In Overturning The Compensatory Damages Award.

Cole's argument that the district court should not have overturned the compensatory damages award is wholly divorced from the abuse-of-discretion standard. Instead of making the case that the district court committed an error of law, that it made a clearly erroneous factual finding, or that its decision was outside the range of those permissible, he merely recites the same arguments from trial. Cole Br. 15-28.

To the extent that Cole attempts to argue that the district court made a clearly erroneous finding of fact or law, he fails. He first argues that the district court should not have considered the evidence presented at trial about the high turnover at Northlands (Br. 18-19); specifically, that of all the Residence Counselors who were at Northlands when Cole was there in July 2018, *none were still working in those position at the time of trial three years later.* JA522-23; 945-46. Cole presents nothing to show this fact was incorrect, and no cases to say that courts should not consider that fact; to the contrary, the Eleventh Circuit affirmed a decision of the district court to limit back pay based on evidence of the average work tenure of employees similarly situated to the plaintiff. *E.E.O.C. v. Mike Smith Pontiac GMC,*

*Inc*., 896 F.2d 524, 530 (11th Cir. 1990). And it simply defies logic to claim that the employment length of other Residential Counselors is not relevant; it is simply Cole's opinion that it is not.

Cole also argues that the district court should not have found that Cole asked to be reassigned to a lower-paying position. Br. 20. But Foxmar presented evidence at trial that if Cole's transfer request had been granted, "he would have had to take a pay cut" to a position of senior cook, making about $37,000 per year. JA448-49; 562-63; 856-57; 932. Thus, the district court's finding was not erroneous, much less clearly erroneous.

Cole then attempts to argue that the district court should not have considered the uncontested evidence in the record that Cole averaged one job every three years prior to working at Foxmar, and then one job every three months after leaving Foxmar. Br. 21-24. Again, this is merely Cole's *opinion*, not based upon fact or law—and indeed, the Vermont Supreme Court has stated on numerous occasions that "the length of employment prior to termination is a factor bearing on the determination that a front pay damage award is reasonable and not too speculative." *Havill v. Woodstock Soapstone Co*., 177 Vt. 297, 308–09 (2004) (citing *Trombley v. Southwestern Vt. Med. Ctr*., 169 Vt. 386, 398, (1999) and *Haynes v. Golub Corp.*, 166 Vt. 228, 238 (1997)). Again, the district court made no factual or legal error in considering Cole's job-hopping history to come to the conclusion that "no rational

19

view of the evidence supports a conclusion that Plaintiff would have worked at NJCC until he was seventy." JA51-52.[10]

Finally, Cole entreats the Court to consider that the jury's award was "only $4,227 more" than the amount of $136,716 listed in Plaintiff's expert's table if Plaintiff worked to the age of 70. Br. 26; JA848. As an initial matter, this is misleading. The district court held that the issue of how much interest to award was an issue for the court, and not plaintiff's expert, and thus the totals that the expert had calculated, which factored in 12% interest, would be redacted and not provided to the jury. JA577-85. Thus, columns 8-12 of Heaps' report were not provided to the jury, and for the jury to award wages for Cole to the age of 70, it would have had to sum all of the values in column 7. JA577-85, 841, 848. That total is $97,267, which means the jury's award of $140,943 was $43,676 more than what Cole's expert calculated Cole was due if he had worked to the age of 70, without interest considered.

There is simply no way to know how the jury arrived at such an unsupported result, and that, in itself, justifies the district court's decision to overturn the compensatory damages award. Indeed, such a result was required under Vermont law: "When front pay is allowed, the damages must be limited to a reasonable period

---

[10] Indeed, the district court's conclusion was further borne out by facts subsequent to trial: *Cole quit his job to move to Michigan to be with his wife* in August 2021. JA1052.

of time, and the amount must not be speculative." *Haynes*, 166 Vt. at 238 (citation omitted). In *Haynes*, the plaintiff calculated the back and front pay due to plaintiff working to the age of 65 to be $140,503, *id.* at 237-38, and the jury awarded $175,000. While the difference was less than $35,000, the court found that the award was excessive because it was not supported by the evidence in the record, and was thus speculative:

> We conclude that the award of front pay in this case was too speculative because it exceeded the amount claimed by plaintiff, who requested damages based on a normal retirement age of sixty-five years. … There was no evidence, however, that plaintiff planned to work beyond age sixty-five. … Thus, even when we view the evidence in the light most favorable to plaintiff, as we must, we do not believe that the $175,000 verdict was within the range of the evidence presented

*Id.* at 238.

So too, here. Viewing the evidence in the light most favorable to Cole, crediting all of Heaps' testimony, without considering interest as that is an issue for the court to consider, the most the jury could award Cole assuming he would work to 70 was $97,267. Instead, the jury awarded him $140,943, almost one-and-one-half times that amount. There is simply no evidence in the record to support such an award, and pursuant to Vermont law set forth in *Haynes*—to which Cole has no

21

response (*see generally* Appellant's brief),[11] the district court was required to find the award to be excessive, and thus did not abuse its discretion in doing so.

B. <u>The District Court Did Not Abuse Its Discretion In Overturning The Punitive Damages Award.</u>

Appellant spends over 20 pages of his brief rehashing his failed argument for why the district court should allow punitive damages to be awarded in the first instance (Br. 28-50)—as opposed to addressing the applicable standard before this Court, which is whether the district court *abused its discretion* in setting aside the punitive damages award. Once Appellant finally does address the relevant standard (Br. 50-56), he presents cursory arguments contending that the court made errors in fact and law in arriving at its decision, but each of these arguments do not withstand a passing breeze.

---

[11] None of the cases Appellant cites applies <u>Vermont</u> law, as *Gasperini* requires, (Br. 26-28) except for Appellant's citation to *Havill v. Woodstock Soapstone Co.*, 181 Vt. 577 (2007), for the proposition that the calculation of lost wages is "'inherently speculative' and '[a] reasonable estimate based on the evidence is all the law requires . . ..')." Br. 28. This quotation is misleading out of context. In the 2007 *Havill* case cited by Appellant, the Vermont Supreme Court found that the trial court "carefully considered the evidence" and "weigh[ed] the[] conflicting proofs." 181 Vt. at 579-580. Thus, the court did not disturb the damages award *because it was supported by the evidence presented at trial*. And indeed, the 2007 *Havill* case cites a previous decision in the matter by the Vermont Supreme Court that while front pay awards cannot be "calculated with mathematical certainty" and have an element of speculation to them, the district court's ruling on any such awards must be based "in light of the evidence." 177 Vt. at 310-311. Appellant's citation to the 2007 *Havill* case does not change that fact.

22

At the outset, Appellant claims that the district court erred in stating that the relevant conduct was limited in scope and duration. Br. 51. And yet, in support of this argument, Appellant goes on to cite the fact that Foxmar had been in business for 27 years, and oversaw nine campuses across the country (51)—missing the point that *with that long history there is no evidence in the record of any other employee* being disciplined, much less terminated, for making a safety-related complaint, or a complaint that employees had to find a replacement before going home sick. Thus, the district court's conclusion that the conduct was limited in scope and duration was wholly accurate. And while Appellant also tries to argue about the risk of possible future harm to other employees (Br. 51), it bears repeating that the first trial took place in July 2021 and the damages retrial took place in December 2022—and at neither trial did Cole present evidence that any other employee was disciplined or terminated for making a safety or sick-leave complaint in the four-and-one-half years since his termination in July 2018. If there was any risk of future harm, surely it could have presented itself within that time, but there is no evidence of any such risk. In short, the district court's statement that Foxmar's conduct was "limited in scope and duration" (JA51) was not clearly erroneous.

Appellant then contends that it was "irrelevant" for the district court to consider the fact that he was a probationary employee. Br. 51-52. But there is no dispute that the law required the district court to consider "the degree of

23

reprehensibility of the defendant's conduct" in order to determine whether the punitive damages award was reasonable. *Shahi v. Madden*, 183 Vt. 320, 334 (2008) (quoting *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)). Accordingly, the district court considered the evidence presented by Foxmar of its non-retaliatory reasons for Cole's termination, including his abandonment of his shift on July 24, 2018, and the discipline he had previously received at Northlands before Foxmar operated the campus. JA53. Appellant does not dispute that it was proper for the district court to do so. *See generally* Br. The fact that Cole was still a probationary employee was simply additional evidence of non-retaliatory reasons for termination. *See* JA824 (July 27 email from Mobley to Brookes): "All staff are on a 90 day probation period and he has not fulfill (sic) his probationary period. He abandon (sic) his job and I had to quickly fill his shift to provide safety and security for students during the prime shift." Simply put, it was not an error of law for the district court to consider this fact.

Appellant also argues that the court erred in stating that Foxmar was seeking to establish higher standards at the Northlands campus. Br. 52. This argument is simply laughable. The evidence showed that Foxmar did not just *seek* to establish higher standards at Northlands, but that it *accomplished* this mission, moving Foxmar's bottom-basement ranking in July 2018 to middle of the pack by July 2021,

and to number 6 in the country by the end of 2022. JA507-08; *see supra* note 6. That the district court recognized this fact was not clearly erroneous.[12]

Appellant then claims it was error for the district court to consider the fact that Foxmar presented evidence that the error in Appellant's termination letter was made in good faith. Br. 53. There is no dispute that the jury did not credit that evidence in finding liability against Foxmar – but there is no case that states the district court may not consider that same evidence when determining the degree of reprehensibility of the conduct. And there is no dispute that Foxmar presented such evidence. *Compare* JA774 (Cole's termination letter) *with* JA824 (Mobley's email

---

[12] In attempting to argue that the district court erred in finding Foxmar was seeking to improve conditions at Northlands, Appellant repeats a litany of supposed horribles, but each of these boogeymen vanish when compared to the record. Br. 52. He claims Foxmar "cut[] the Safety Officer position" – but it simply combined the position with the property manager position, and Appellant's own witness admitted that only a part-time position was needed at a minimum. JA283. He cites "drastically cutting food costs," "poor food quality," and the student with a three-inch blade not being reported to the DOL, but that was irrelevant hearsay (JA273-74, 277-78), which is why the district court disallowed such testimony at the damages retrial. He cites "failing to provide cleaning supplies," when the evidence showed that Appellant was able to keep his dorm fully stocked with cleaning supplies (JA197); it was only when he covered another Resident Counselor's (Howell's) dorm that he found that *she* had not ordered supplies as required, so Mobley (not Appellant) quickly provided them (JA 92, 187, 193). He claims Foxmar "fail[ed] to address mold" – but there is no evidence in the record that whatever Howell found, even if it was mold, was not cleaned after it was found. He claimed Foxmar "impos[ed] an unlawful sick leave policy on employees" – and yet his own witness testified repeatedly that an employee needing to find their own replacement was *not* the policy of Foxmar (JA251, 300, 302), and that when Foxmar learned that Howell was sick on July 24, Brookes sent Howell home (JA319-20, 434-35).

containing the same errors) *and* JA299, 427, 458-59, 509-12 (testimony regarding confusion over scheduling when Foxmar took over operations at Northlands in June 2018). Thus, the district court committed no error of law.

Flailing about for some basis for restoring the punitive damages award, Appellant then makes a statement that must be called out for what it is: a whopper. Appellant states that it was "erroneous" for the district court to find that "there was no evidence that other employees had been disciplined or terminated" for making a complaint. Br. 53. In support of this fatuity, Appellant lists several citations to the record, curiously without any explanation of their contents or import. We therefore examine each, in turn. JA273-76 is Grangent's testimony about the student with the three-inch blade, and contains no evidence of an employee being disciplined or terminated. JA280-81 is Grangent's testimony about poor food quality, and contains no evidence of an employee being disciplined or terminated. JA324 is Howell's testimony that she felt Mobley and Brookes told employees they should not make complaints—but again, contains no evidence of an employee actually being disciplined or terminated for doing so. And JA329 is Howell's testimony about Bezon telling her she shouldn't have listed mold in the dorm log, something that *Howell considered to be* a verbal reprimand, not that it *was* a verbal reprimand. And indeed, Howell testified that she was not disciplined for making complaints to Mobley, or her replacement, Burditt. JA326-27, 330-31.

26

That leaves Appellant's citation to JA297. This contains Grangent's testimony that Foxmar terminated her, and that she felt her termination was not justified. There can only be one reason Appellant cited this testimony: Appellant is attempting to imply to this Court that Grangent was terminated in retaliation for making safety complaints. Let us leave aside that there is no allegation of this in the instant complaint. Let us leave aside that there is no evidence in the record of this.[13] What we cannot leave aside, however, is that this very issue was litigated in the court below, and Appellant did not appeal this ruling.

To summarize pages of argument, at the damages retrial Appellant attempted to elicit testimony from Grangent that she was terminated in retaliation for making safety complaints. Foxmar objected on the basis that at her deposition, Appellant's counsel had precluded Grangent from testifying to this very issue, citing attorney-client privilege. The district court ruled that Appellant could not use the privilege as sword and shield, and despite Appellant's multiple attempts to revisit and work around the district court's ruling, the court repeatedly informed Appellant that Grangent could not provide testimony implying she was terminated in retaliation for

---

[13] At the initial trial, when the parties were conferring with the Court regarding admission of the disputed food evidence, the Court asked counsel for Appellant whether Grangent would testify that she was retaliated against. Counsel responded, "I'm not sure, your Honor. I can ask her if she feels she's been retaliated against." JA289-90. However, he did not do so, limiting his question to whether Grangent felt her termination was justified.

27

making safety complaints. December 2022 Trial Transcript pp. 186-97, 301-06, 323-31, 334 (Doc. No. 224). Given Appellant's previous objections to questions of Grangent regarding the reason for her termination, and the district court's evidentiary ruling on this issue that Appellant did not appeal, Appellant cannot now claim, state, imply, allege, or suggest that Grangent's termination was somehow retaliatory or supports a non-existent "pattern" of retaliation. And the district court did not err in its finding that there was not evidence of any other employee being disciplined or terminated for making a complaint.

Appellant next contends the district court committed legal error by considering the amount of penalties available under VOSHA and VESTA, stating that such penalties were not "comparable" (Br. 54-56)—*but Appellant's claims were brought under VOSHA and VESTA*. And while the penalties apply if the state finds a safety violation (VOSHA) or that a company requires employees to find replacements before going home sick (VESTA)—as opposed to retaliating against employees for complaining about such an issue—it is lunacy to attempt to argue that the penalties associated with the underlying VOSHA and VESTA issues *have no relevance* to retaliation claims brought under VOSHA and VESTA.[14]

_____

[14] In the case that Appellant cites as an example of this Court finding the statutory penalty was not comparable, the defendant engaged in massive fraud, including filing false criminal charges against senior executives of Motorola and Nokia, to swindle those companies out of *two billion dollars*, as opposed to using "false advertising in promotional give-aways" as contemplated by the state statute.

28

Finally, Appellant does not mention the district court's consideration of the fact that the jury's punitive damages award was "one of the largest employment verdicts in Vermont history." JA53. Indeed, a search of Vermont cases shows the jury's original verdict was the largest employment verdict in state history. Not only that, but also there are only three Vermont cases awarding punitive damages for retaliatory discharges, with amounts much, much less than $3 million:[15]

- In *Bain v. Wrend*, No. 15-CV-202, 2019 WL 7972050 (D. Vt. 2019), a jury awarded a union employee who successfully alleged he was terminated in retaliation for exercising his First Amendment rights $75,000 in punitive damages.

- In *Delosa v. Burlington Elec. Dept.*, 2003 WL 25930959 (Vt. State Ct. 2003), a jury awarded an employee who was terminated two weeks after complaining about sex discrimination $100,000 in punitive damages.

- And in *Fernot v. Crafts Inn, Inc.*, 1994 WL 766829 (Vt. State Ct. 1994), a jury awarded an employee who was terminated after complaining about sexual harassment $95,000 in punitive damages.

---

*Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 42-44, n.9 (2d Cir. 2004). There is no such chasm between the relevant conduct and the statutes governing that conduct here.

[15] The Vermont jury verdicts database in Westlaw was searched for any cases containing both "punitive" and words starting with "retaliat," "terminat," or "fire."

Simply put, Appellant cannot credibly claim that the $3,000,000 punitive damages award for employment retaliation was not an outlier among Vermont verdicts. The district court was well within its discretion to find the award grossly excessive, and to order appropriate relief.

In sum, Appellant provides no basis for the Court to conclude that the district court committed legal error, made a clearly erroneous factual finding, or that its decision was outside the permissible range of decisions. For all these reasons, the district court's order setting aside the compensatory and punitive damages verdict and ordering a new damages trial should be upheld.

## II. The District Court Did Not Abuse Its Discretion in Ordering a New Trial Instead of Remittitur.

Appellant contends that the district court abused its discretion in ordering a new trial for damages instead of granting remittitur. Br. 56. This argument is practically nonsensical, which is why Appellant can cite no case for the proposition that a district court abused its discretion in ordering a new trial instead of remittitur.

The Reexamination Clause of the Seventh Amendment "does not inhibit the authority of trial judges to grant new trials for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States. That authority is large." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996) (citation omitted). As the Supreme Court stated in *Gasperini*, "'The trial

judge in the federal system,' we have reaffirmed, 'has ... discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence.'" *Id.* (quoting *Byrd v. Blue Ridge Rural Elec. Cooperative, Inc.*, 356 U.S. 525, 540 (1958)). Accordingly, "[t]his discretion includes overturning verdicts for excessiveness **and ordering a new trial without qualification**, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Id.* (emphasis added).

Without qualification means without qualification. There is no qualification to the district court's ability to order a new trial if the jury's verdict is against the weight of the evidence. That is why Appellant cannot cite, or find, any cases for the proposition that a court abused its discretion by ordering a new trial for damages as opposed to remittitur. There are cases for the counterfactual – whether a district court abused its discretion in ordering *remittitur* instead of a new trial – on the basis that it is not appropriate for a court to grant remittitur when there has been prejudicial error in the trial, because in such cases, any proposed remittitur would be "totally out of proportion" with the initial award. *See Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38, 40 (2d Cir. 1997); *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1027–28 (2d Cir. 1991).

So too, here. A review of other employment retaliation damages awards in Vermont suggests the maximum possible punitive damages award would be in the

31

neighborhood of $100,000. Indeed, the December 2022 jury that did not hear the irrelevant and prejudicial testimony about students supposedly being served food "not as good as prisoners were fed" (JA279-80), and that was another year-and-a-half removed from the COVID pandemic,[16] found that Plaintiff was entitled to *no* punitive damages. Thus, any such remittitur that the district court would have ordered would have been quite substantial to get from $3,000,000 down to the neighborhood of $100,000, and thus "totally out of proportion" with the $3 million originally awarded, making remittitur inappropriate.

Appellant's argument that the district court should not have ordered a new trial for damages, and should have provided a remittitur instead, raises another question—what remedy is Appellant seeking? To the extent that Appellant contends that the district court should have provided a remittitur, there is no evidence that Appellant would have accepted it. Indeed, Appellant rejected an offer for $375,000 (JA 19, Docket No. 215); there is no reason to believe Appellant would have

---

[16] The likely impact of the COVID pandemic on the original jury cannot be overstated. COVID was the first thing that the district court covered with the jurors during orientation. July 2021 Trial Transcript, p. 3 ("I want to talk about COVID first."). All jurors and counsel were masked, unless counsel was at a lectern behind plexiglass. *Id.* at 106 ("Before we start opening statements, I want everybody to do a mask check. Make sure you have your mask above your nose, and we will go forward ..."). In 2018, it was not unusual for people to report to work while not feeling well. *See* JA183-84 (Cole's testimony that he and other employees would report to work not feeling well before the pandemic). But in the throes of the COVID pandemic, when the first trial took place, it was unthinkable to report to work with a cold, cough, fever, sore throat, or upset stomach.

15981228.3 7/26/2023

accepted a remittitur below that amount. And had Appellant rejected any conditional remittitur, the only course of action then would be to have a trial for damages—but that has already taken place.

Also, while Appellant generally asks the Court to "grant remittitur," he specifies no amount.[17] Br. 62. We imagine that if the Court were to grant a conditional remittitur of $55,000, Appellant would reject it—and again, the remedy would normally be a damages trial, but that has already taken place.

Because the district court had the discretion "without qualification" to order a new trial upon finding the jury's award excessive, and because Appellant has no remedy even if the district court should have provided a remittitur, the district court's order granting a new trial for damages should be upheld.

## III. The District Court Did Not Abuse Its Discretion in Excluding Irrelevant and Prejudicial Evidence.

Appellant contends that the district court erred in excluding evidence about food quality at Northlands, and that it supposedly made students sick; and that the district court erred in excluding evidence about the instance in which a student brought a knife with a three-inch blade to campus, regarding which Grangent claimed she was instructed not to report to the USDOL. Br. 60.

---

[17] Appellant cannot now request a particular remittitur amount for the first time in his reply.

33

As an initial matter, the trial judge has broad discretion in the matters of evidence rulings, and such rulings "requir[e] 'manifest error' to disturb them." *Starter Corp. v. Converse, Inc*., 170 F.3d 286, 292 (2d Cir. 1999) (quoting *Proteus Books Ltd. v. Cherry Lane Music Co*., 873 F.2d 502, 514 (2d Cir.1989)).

Appellant, however, shows no manifest error in the judge's decision to exclude these two items. First, there is the issue of relevance. This was a case of an employee contending he was terminated because he complained about a lack of cleaning supplies and employees finding their replacements before going home sick. The quality of the hamburger meat eaten by students in the cafeteria, and whether a student was provided a second chance instead of being ejected from the program for bringing a small knife to campus are quite far afield from whether Appellant was retaliated against, as the district court stated. JA666-67, 671.

Second, there is the issue of prejudice. Appellant argues that the district court's decision to exclude the food and knife evidence was in error because it reversed its decision in the prior trial to admit such evidence. Br. 60. That is bunk. What occurred was that *the district court recognized it had made an error and corrected it.*[18] Indeed, at the first trial, when Appellant first elicited the food quality testimony through Grangent and Foxmar objected based on relevance, a <u>juror</u> was

---

[18] By Appellant's logic, a district court could never revisit its prior rulings, an absurd result. *See also* Fed. R. Civ. P. 60.

34

recorded as stating "safety" for the reason the meat quality was relevant to Appellant's claim, showing how highly prejudicial that evidence was to the jury. JA276. Thus, when the jury returned a verdict that had no connection to the evidence, in an amount that surprised the district court (JA647), the court corrected the error, first by setting aside the verdict, and then by excluding prejudicial evidence at the damages trial that contributed to that verdict. At the hearing to set aside the verdict, the district court found that the meat and knife evidence had "almost nothing to do with this case," were "inflammatory," were "pure propensity evidence to establish that the defendant in general is a bad employer,'" and were prejudicial. JA674-75, 677. Nothing in Appellant's brief or arguments shows that this finding was in error, much less manifest error.

Third, there is the issue of hearsay. Appellant contends that the complaints about the food should be allowed under a hearsay exception. Br. 60-62. But Appellant's proffer for the food complaints was Grangent testifying that the wellness department was reporting to her that students were reporting to the wellness department that the food was making them sick. JA668, 683-84, 695; December 2022 Trial Transcript pp. 298-300. That is not a present sense impression, something the district court considered. JA684 ("Present sense impression has to be right at the time. So they would have to be throwing up in the office as they're making the complaint."). That is not a medical statement, which again, the district court

considered. *Id.* Reliable evidence that food was actually making a particular person sick would be that person's medical records or testimony, or the testimony of that person's medical provider, *not* the telephone-game testimony of someone who heard from someone who heard from someone else that they might be sick.

In short, Appellant's contention that the district court excluding irrelevant, prejudicial hearsay was somehow error, much less manifest error, is utterly baseless, and there is no basis for disturbing the district court's evidentiary rulings.

## CONCLUSION

Appellant took a number of gambles in this case. He asked the jury for 35 times more in punitive damages than any employee suing for retaliation had ever been awarded. He also waited until his rebuttal in closing arguments to disclose that number. And at first, that gamble paid off: the jury awarded $3 million in damages.

After the district court reversed the jury's award, Appellant almost settled the matter—but then went back to the betting table, pulling out of the settlement, and turning down a $375,000 offer of judgment like a Deal or No Deal contestant dreaming of a million-dollar suitcase. But this time, the gamble did not pay off, and the jury issued an award that comported to the evidence presented at trial.

And as much as Appellant would like to turn back the clock to the July 2021 verdict, the simple fact is that there is no evidence that the district court made any legal error or clearly erroneous factual finding, or otherwise abused its discretion

36

when it set aside the jury's damages verdict, ordered a new trial on damages, and excluded irrelevant, prejudicial hearsay at the damages trial. As a result, the decision of the District Court should be affirmed, along with such relief the Court deems just and proper.

DATED:  July 26, 2023         BOND, SCHOENECK & KING, PLLC

                                      By:  /s Michael D. Billok

                                          Michael D. Billok
                                      Paul J. Buehler
                                      268 Broadway, Suite 104
                                      Saratoga Springs, NY 12866
                                      Telephone: (518) 533-3000
                                      Fax: (518) 533-3284
                                      *Attorneys for Appellee*

15981228.3 7/26/2023

## Certificate of Compliance With Type-Volume Limit,
## Typeface Requirements, And Type-Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,327 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 in 14 point Times New Roman style.

DATED: July 26, 2023             BOND, SCHOENECK & KING, PLLC

                                            By: /s Michael D. Billok
                                                Michael D. Billok
                                            268 Broadway, Suite 104
                                            Saratoga Springs, NY 12866
                                            Telephone: (518) 533-3000
                                            Fax: (518) 533-3284
                                            *Attorney for Appellee*

15981228.3 7/26/2023